MATTER OF THE ESTATE OF MABEL FRENCH, DECEASED. EDYTH M. BROWN, OBJECTOR AND APPELLANT, v. EMMETT KELLY AND EARL T. GANGNER, PETITIONERS AND RESPONDENTS.

No. 9921.
Submitted December 1, 1959. Decided April 21, 1960.
Rehearing denied May 11, 1960.
351 Pac. (2d) 548.

John H. Risken, Helena, for appellant.

John H. Risken argued orally for appellant.

Coyle & Rotering, Butte, for E. T. Gangner.

Thomas F. Kiely, Butte for Emmett Kelly.

Thomas F. Kiely, Butte, and W. E. Coyle argued orally for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from an order of the district court in and for the county of Silver Bow admitting a holographic will to probate. Mabel French died in Butte on July 13, 1957. The only surviving relatives are several cousins, all of whom are non-residents of the state. After her death, several documents were discovered among the decedent's effects, two of which purported to be testamentary dispositions of her property.

The sole beneficiary, under both the above instruments, petitioned the court to admit a typewritten will bearing the date July 18, 1955, to probate. Edyth M. Brown, a cousin of the testatrix, filed objections to admitting this will to probate and subsequently a hearing was held to determine whether or not this will could qualify for probate.

Petitioner's exhibit No. 1 is a holographic will entirely in the handwriting of the testatrix and signed by her. Appended to the body of this will is the phrase "In witness whereof I have herewith set my hand and seal this [blank] day of [blank] 1951. [signed] Mabel French." On the back of this instrument the testatrix wrote "I started to make out a will but owing to attorney's fees, tax, etc., I make it the other way for *you Mabel*." Emphasis supplied.

On July 18, 1955, the testatrix executed petitioner's exhibit

No. 2, which is a typewritten will signed by Mabel French and witnessed by Margaret H. Tullis and Pauline Murphy Hitt. This will, though witnessed, had no attestation clause and the name of the sole beneficiary and executor was filled in by pen in the handwriting of testatrix rather than being typewritten.

The sole beneficiary, Dr. Earl T. Gangner, did not appear at the hearing. Mrs. Margaret Tullis was the only witness introduced by the petitioner to prove the validity of the will. She testified that she and the testatrix were good friends up until two years before the hearing was held, and that the witness was of sound mind when this will was executed. Further testimony by this witness showed that the testatrix had signed this will in the presence of both witnesses and all were present when the witnesses signed. The testatrix had stated to the witnesses that the document was her will and she asked them to witness it for her. On direct examination, the witness was asked "You don't know anything about the contents of the Will?" She replied, "No, I didn't look at that. I just witnessed her signature." Later in the testimony the witness volunteered this statement: "And this I do know: this was blank [indicating the space where the name Earl T. Gangner, M.D., had been inserted by the testatrix]. I know that. There was nothing on there, no signature. Only her signature, I witnessed that. She signed that in front of Pauline and myself." On cross-examination the witness stated: "That's right. It was a blank. She wouldn't put that in there and let me see it anyway. Anyway I wouldn't look for it because it wasn't my business, and they both were blanks."

The other exhibits introduced by the petitioner are, under our view of the case, of no importance in this appeal except to note that they all express an intent that Dr. Gangner should receive certain assets which the testatrix possessed. One exhibit, dated the same day as the typewritten will, contains instructions to Dr. Gangner regarding her burial and in general expresses the trust reposed in Dr. Gangner by the testatrix.

At the conclusion of the testimony, the trial judge took the matter under advisement and subsequently admitted petitioner's exhibit No. 1, the holographic will, to probate. In the same order he sustained the heir's objections to exhibit No. 2, the typewritten will, and denied it probate.

The respondent contends that the holographic will is valid even though the only date it bears is the year 1951. The court below based its order admitting this will to probate on the case of In re Irvine's Estate, 114 Mont. 577, 139 P.2d 489, 147 A.L.R. 882. The statute which we are here concerned with is section 91-108, R.C.M.1947, which provides as follows:

"Definition of a holographic will. A holographic will is one that is entirely written, dated, and signed by the hand of the testator himself. It is subject to no other form, and may be made in or out of this state, and need not be witnessed."

In the Irvine case, this court held that a holographic will, bearing the month and year but not the day on which the will was executed, constituted substantial compliance with the above statute and was entitled to be admitted to probate.

■■ The statutory requirement of dating a holographic will is based primarily on two grounds: (1) In order that the courts may determine whether the testator had the requisite testamentary capacity when he executed the will; and (2) If there are two or more wills, containing incompatible provisions, in order to determine which is the later will. In re Noyes' Estate, 40 Mont. 190, 105 P. 1017, 26 L.R.A., N.S., 1145. It is possible that if the month is given this is a sufficient delimitation to enable the courts to determine the above questions should they arise. Given only the year, however, we fail to see how the courts could determine such questions. In this latter situation, the contestant would have each of 365 days, testamentary incapacity on any one of which could invalidate the will. Conversely, the proponent of the will would have to be prepared to rebut evidence of testamentary incapacity on any day

throughout the given year. Due to these complications, we feel that a holographic will which is dated with the year but not the day or month on which it was executed does not constitute substantial compliance with section 91-108, supra.

██ In addition to what has been said above, the writing on the back of this instrument illustrates, when viewed with subsequent documents and actions, that the testatrix did not intend this instrument to operate as a will. If the requisite animus testandi is lacking, the instrument cannot stand as a valid will. In re Watts' Estate, 117 Mont. 505, 160 P.2d 432. It is evident that Mabel French did not intend this instrument to be her last will and testament because of this writing and also because the typewritten will was in exactly the same language as the holograph, thus effectuating the intent which she expressed on the back of the holograph to "make it the other way".

██ A probate proceeding is equitable in nature and is governed, on appeal, by rules of equity. In re Woodburn's Estate, 128 Mont. 145, 273 P.2d 391. The district court, in admitting the holographic will to probate, sustained the heir's objections to the typewritten will but gave no reasons for this ruling. We must infer that this action was taken because the court had decided to admit the holographic will to probate. Under our view, that the holographic will is invalid, it is necessary to briefly consider the typewritten will so that on remand the district court will know our views on the subject.

██ The first objection to the typewritten will is that it lacks an attestation clause. While we feel that the better practice is to include an attestation clause so that it may operate as prima facie evidence of the validity of the will, such a clause is not absolutely necessary under our statute, section 91-107, R.C.M. 1947, which requires no formal attestation clause. In re Woodburn's Estate, supra; see also 94 C.J.S. Wills, § 196; 57 Am.Jur., Wills, § 296; 5 Wigmore, Evidence,

§ 1512 (3d ed. 1940); 1 Page, Wills, § 373 (3d ed. 1941); and cases cited therein.

Since there is no question here regarding compliance with the statutory formalities of execution and attestation, the lack of an attestation clause should not cause the will to be denied probate. It is the fact of attestation and not its recitation that the statute requires.

■■■ The second objection to the typewritten will is that there are blanks in the will which were filled in by the testatrix with the name of the sole beneficiary and executor, Dr. Earl T. Gangner. There is a well-recognized presumption of law that blanks in a will which are left for the insertion of names of legatees are presumed to have been filled in before the execution of the will. See generally 67 A.L.R. 1138, 1144, and 34 A.L.R.2d 619, 634.

This court has held that "No will, fair upon its face, should be denied probate, except for good and sound reasons. The policy of our courts is to sustain a will, if it is possible to do so, and every reasonable presumption will be indulged in favor of the due execution of a will. The presumption is against intestacy." In re Woodburn's Estate, 128 Mont. at page 151, 273 P.2d at page 394, supra.

In the instant case the writing, in the two places where the name, Dr. Earl T. Gangner, has been inserted, is apparently in the same handwriting, and signed with the same pen and ink as the signature of the testatrix.

Given the above presumptions, (1) against intestacy and (2) that the blanks were filled in before execution, coupled with the similarities of pen, ink and handwriting, we feel that the district court should reconsider the typewritten will. The only evidence which raises any question as to the validity of the will is the self-impeaching statement of Mrs. Tullis. This statement should be carefully reconsidered by the court and further testimony taken if necessary so that the court will be in a position to determine whether the testimony of this witness

is worthy of belief in these particulars; and if so, whether it is sufficient to rebut the presumptions discussed above.

There has been no cross-assignment of error in this case and therefore we will not decide the validity of the typewritten will.

The cause is reversed and remanded to the district court with instructions to take further proceedings not inconsistent with this opinion.

MR. CHIEF JUSTICE HARRISON concurs.

MR. JUSTICE ANGSTMAN concurring specially.

I concur in the opinion of Mr. Justice Castles on the only point presented by the appeal. That point is whether the instrument dated 1951 was properly admitted to probate as a holographic will. The case of In re Irvine's Estate, 114 Mont. 577, 589, 139 P.2d 489, 498, 147 A.L.R. 882, quoted with approval from 1 Page on Wills (3d ed.), p. 702, the following: "If the date gives the year and the month, but without the day of the month, some courts have held that such date is insufficient; while others have held that it is sufficient." There are no cases that hold a document is sufficiently dated with nothing but the year given as here.

There is much said in the dissenting opinion of Mr. Justice Adair to the effect that Exhibit 2, the instrument dated July 18, 1955, should be admitted to probate as a valid will. Respondents have not filed a cross appeal. They have made no cross assignments of error raising this point. They do not argue that it is a valid will. Both opinions indicate that it is a valid will and with that I agree.

The only substantial difference between the two opinions is the matter of directions to the district court. The opinion of Mr. Justice Castles directs the district court to reconsider the question as to whether it was properly attested as a will, either on the evidence already taken or on additional evidence.

This conclusion was arrived at because of the fact that

having admitted the instrument of 1951 to probate the court, in all probability, gave but little consideration to the instrument executed on July 18, 1955, which contained the identical language.

Since the question is not argued here and very likely was not argued in the trial court and since in all probability was given but little, if any, consideration by the trial court, the directions given in the opinion of Mr. Justice Castles, I think, are proper. Whether the instrument dated 1951 should be taken and considered with the instrument dated July 18, 1955, under section 91-204 is of no moment here because there is no dispute as to the intention of testatrix. Both instruments are identical in form and substance and clearly express her intention.

I concur in the dissenting opinion of Mr. Justice Adair so far as it holds that Dr. Gangner should not be ruled out as executor without notice and hearing on charges regularly made, and I also agree with much that is said in the opinion of Mr. Justice Adair regarding the rights of the public administrator, though as to the latter question there is some doubt whether it is properly before us, a point on which I express no opinion.

MR. JUSTICE ADAIR dissenting:

The record presented on this appeal reveals a most startling and shocking attempted spoliation of the estate of Mabel French, deceased, the whole of which estate, the decedent left to Dr. Earl T. Gangner, whom she named and appointed sole executor.

In the period from 1951 to 1957, both inclusive, Mabel French made and signed *five* separate instruments written on *five* separate sheets of paper wherein she wrote *words,* which taken and construed together, clearly express and evidence her definite intention to make testamentary disposition of all her property at her death.

It is not any single one of these sheets of paper, standing alone, that constitutes the decedent's last will. It is the *words*

that are written on all five sheets that constitute *the will* of Mabel French.

"A will is not a sheet of paper, nor a number of sheets of paper; *it is the words written thereon.* The law affords the right of testamentary disposition; such disposition is to be gathered from *language* \* \* \*'". Emphasis supplied. In re Golden's Will, 165 Misc. 205, 300 N.Y.S. 737, 738. Also see In re Chase's Estate, 51 Cal. App.2d 353, 124 P.2d 895, 899.

No one of the *five* instruments is either inconsistent, irreconcilable, or incompatible with any of the others.

None of these instruments stands alone. They all stand *together* as one instrument.

Mabel French kept these instruments *together* in what she termed her "strong box" where, at her death, they were all found *together*.

On the fifth day after Mabel French's death, all *five* instruments were placed in a blue linen envelope and filed *together* in the office of the clerk of the district court for Silver Bow County.

At the trial, in the district court, the five instruments were identified and received in evidence *together* and marked as Exhibits Nos. 1, 2, 3, 4 and 5 herein.

All *five* instruments must be taken and construed *together* as one instrument. So says the law.

R.C.M. 1947, § 91-204, reads:

"91-204. (7019) *"Several instruments are to be taken together.* Several testamentary instruments, executed by the same testator, are to be taken and construed together as one instrument." Also see R.C.M. 1947, §§ 91-205 and 91-125.

The trial judge neither observed nor obeyed the plain and express mandate of the provisions of section 91-204, supra.

This failure, to follow the law as it is written in section 91 204, has precipitated much of the confusion attendant upon the proceedings in both the trial court and in this, the supreme court.

The trial judge singled out and separated decedent's 1951 holograph, Exhibit No. 1, from its companions and admitted this lone instrument to probate as the last will and testament of the decedent. This done, the trial judge then sustained the appellant Edyth M. Brown's objections (quoting the trial judge) "to the other instruments offered as the last will and testament of decedent, to-wit: Exhibits Nos. 2, 3, 4, and 5" all of which he erroneously refused to admit to probate.

On the appeal to this court, Mr. Justice Castles, in his review, first took, isolated and considered decedent's 1951 holograph, Exhibit No. 1, separate and apart from its companions and wound up by declaring it to be invalid. He indicated that the 1951 holograph, Exhibit No. 1, badly needed the *day* and the *month* in addition to the year of its execution, to make it valid and that to give only the year 1951 was wholly insufficient to meet the requirements of R.C.M. 1947, § 91-108, defining a holographic will.

The statute requires that decedent's 1951 holograph, Exhibit No. 1, and her 1955 witnessed will, Exhibit No. 2, "are to be taken and construed together as one instrument". Section 91-204, supra. The 1955 witnessed will, Exhibit No. 2, has two complete dates. The first date, "July 18, 1955", is written at the beginning of the instrument. The second date consists of a complete testimonium clause written at the end of the instrument. Such clause reads: "In witness whereof I have herewith set my hand and seal this 18th day of July, 1955". Neither date is required by the provisions of the governing statute, § 91-107, supra. Either date could have been taken and construed to supply any deficiency complained of in the 1951 holograph, Exhibit No. 1, thus enabling it to strictly and fully conform to all the requirements of section 91-108, supra.

The dispositive and testamentary *words* written by the hand of Mabel French in longhand script in Exhibit No. 1 and the same dispositive and testamentary *words* employed by her in

the writing of Exhibit No. 2, express and evidence one and the same testamentary intent, and one and the same will.

When taken and construed together as one instrument, Exhibit No. 1, and Exhibit No. 2, express and evidence a complete and valid will. No lawyer in this state could have drafted a better one. It fully meets all the statutory requirements governing the execution of a valid witnessed will.

In sustaining appellant's objections to Exhibits Nos. 2, 3, 4 and 5 and in refusing to admit such exhibits, together with Exhibit No. 1, to probate the trial court committed reversible error.

In Estate of Moody, 118 Cal.App.2d 300, at pages 307, 308, 257 P.2d 709, at page 713, it is said:

"The will of a person is the aggregate of his testamentary intentions, so far as they are manifested in writing (excluding nuncupative wills), duly executed according to the statute; it is the sum total of the testamentary writings intended by the testator to constitute his will. It may consist of several sheets of paper, and it does not in and of itself matter that one of such sheets standing alone would not constitute an executed will. (Mitchell v. Donohue, 100 Cal. 202, 207-208, 34 P. 614, 38 Am.St.Rep. 279). * * *

"* * * It is not essential that the entire will be written on the same date; its writing need not have been a single, continuous performance. In re Estate of Clisby, 145 Cal. 407, 409, 78 P. 964, [104 Am.St.Rep. 58]. Signed but undated clauses added to a dated holograph have been admitted to probate as a part of the will on the theory that it is not essential that the entire will be written on the same date. In re Estate of Clisby, supra."

*Intermeddlers.* Neither Frank Quinn, who instituted these proceedings in the district court, nor Emmett Kelly, the public administrator for Silver Bow County, had any standing whatever in these proceedings. Neither was "a person interested"— that is, interested in the estate, and not in the mere fees of

an administration thereof. See In re Sanborn's Estate, 98 Cal. 103, 105, 32 P. 865, 866; State ex rel. Eakins v. District Court, 34 Mont. 226, 85 P. 1022; State ex rel. Hill v. District Court, 126 Mont. 1-5, 242 P.2d 850, 31 A.L.R.2d 749. Both Quinn and Kelly were unauthorized intermeddlers. Both were and are clients without a cause. Neither is entitled to any "cut" or fees from, or out of this estate which was given and bequeathed to Dr. Earl T. Gangner and to whom it belongs subject only to the discharge of the just debts and obligations of the testatrix.

A full, fair, just, and correct determination, *under the law*, of all the questions, both of fact and of law, requires a full understanding of all the essential facts as well as of the controlling statutes and decisions.

*The Facts*. In the year 1929, Mabel French, a single woman, entered the employ of the Post Publishing Company, at Butte, Montana. She continued in such employment until some time in the year 1957. Her work was that of a newspaper woman. She worked on both The Butte Daily Post and The Montana Standard of which last-named daily newspaper she was the long-time capable society editor.

On July 13, 1957, Mabel French died in the Community Hospital at Butte, Montana. She left an estate consisting of both real and personal property, then of the estimated value of between $26,000 and $30,000 or more, all situate in Silver Bow County, Montana, wherein she resided and made her home during all of the above-mentioned years.

Mabel French left no husband, child, father, mother, sister or brother. See R.C.M. 1947, § 91-1405. At the time of her death, she had no known relative or next of kin residing anywhere within the State of Montana.

At the initial hearing held in the district court on August 9, 1957, Frank Quinn, a newswriter and columnist for both The Butte Daily Post and The Montana Standard and long-time fellow employee of Mabel French, called as a witness on behalf

240

of the proponent, Dr. Earl T. Gangner, testified that during Mabel French's last illness, her attending physician informed the witness, that his patient was dying and asked that the witness attempt to contact the dying woman's nearest relatives and apprise them of such fact. The witness Quinn testified:

"I contacted Mr. Virgil McGee in Palto Alto, California, and he, in turn contacted Mrs. Brown and Harry McGee, and they came to Butte, and I helped with the funeral arrangements and so forth."

The "Mrs. Brown" mentioned in Mr. Quinn's above-quoted testimony is Edyth M. Brown, the appellant herein, who resides at 720 East 75th Street, in Cheney in the State of Washington, and who represents herself to be a cousin of Mabel French.

Harry McGee, referred to in Mr. Quinn's above-quoted testimony, likewise is an actual bona fide resident of the State of Washington who resides on Route 1, Oaksdale, Washington, and who is represented to be a cousin of Mabel French.

At the time of her death and, for a number of years prior thereto, Mabel French maintained and made her home in a rented apartment in the Tripp and Dragstedt Apartments in the City of Butte, Montana.

*Frank Quinn Takes Over.* Immediately following Mabel French's death on July 13, 1957, Frank Quinn proceeded to take over the affairs pertaining to decedent's estate by proceeding to the Tripp and Dragstedt Apartments, accompanied by Mr. Chazer, the deputy coroner of Silver Bow County, where, after contacting Mrs. Jones, the landlady in charge of said apartment building, the three, namely, Quinn, Chazer and Mrs. Jones entered and searched the apartment and home of Mabel French, where, among her personal possessions and effects the three searchers discovered what Mabel French called her "strong box" which contained, among other valuable papers, *five* separate instruments in writing, each and all bearing the signature of Mabel French written in ordinary longhand script by the hand of Mabel French, herself, which *five* writings, collectively

and *"taken and construed together as one instrument"* (R.C.M. 1947, §§ 91-204, 91-205), set forth and plainly express the last wishes, directions and will of Mabel French, in the event of her death, as to the disposition of all her property, both real and personal; the payment of her just debts; the handling and administration of her estate; the conduct of her funeral and burial; the collection and disposition of the proceeds of her group life insurance policy and the location of her checking account, — of her safety deposit box and her investments and savings, including her stocks and bonds.

Frank Quinn testified that upon discovering decedent's strong box containing the above-mentioned five instruments he "looked over some of them" and Mr. Chazer, the acting coroner, then "took them" with him.

The original instruments have been marked as Exhibits Nos. 1, 2, 3, 4 and 5 herein and a photocopy of each is inserted later in this opinion.

The law of Montana requires that "Every *custodian* of a will, within thirty days after receipt of information that the maker thereof is dead, *must deliver the same to the district court* having jurisdiction of the estate, or *to the executor named therein*." R.C.M. 1947, § 91-801. Emphasis supplied.

The one and only executor named, nominated and appointed by Mabel French in her above dispositive testamentary writings is Earl T. Gangner, M.D.

The self-appointed *custodian* of the wills of Mabel French elected to comply with the provisions of section 91 801, supra, by delivering *"the same to the district court"* rather than *"to the executor named therein"*, namely, Earl T. Gangner, M.D., section 91-801, supra.

*Quinn Commences These Proceedings.* On July 18, 1957, being five days after the death of Mabel French, Frank Quinn commenced these probate proceedings, No. 15824, in the district court for Silver Bow County, by *filing simultaneously* therein the following, viz:

1. A blue envelope containing the five written instruments of testamentary character that had been found in and taken from the "strong box" in Mabel French's apartment by Frank Quinn and Mr. Chazer, the deputy coroner;

2. A typewritten "Request for Appointment of Administrator" subscribed by Harry McGee and Edyth M. Brown, the nonresident cousins, requesting that the district court appoint Frank Quinn, as administrator of Mabel French's estate; and

3. A "Petition for Letters of Administration" signed by Frank Quinn requesting that letters of administration be issued him on the grounds that he is a person competent to act as the administrator "and that it is the desire of certain of the next of kin [Harry McGee and Edyth M. Brown] that he be appointed as such, as is evidenced by their requests to the Court *filed simultaneously* herewith." Emphasis and bracket insert supplied.

*Request for Appointment Void.* Since the petitioners, Harry McGee and Edyth M. Brown, then were and still are actual bona fide residents of the State of Washington, it follows that under the Montana law neither is either competent, eligible or entitled to be appointed or to serve as administrator or administratrix of this estate. See R.C.M. 1947, § 91-1405, subd. 2.

Nor did either of these nonresident cousins have the right to petition or to request the district court or judge to appoint Frank Quinn or any other person to act or serve as the administrator of this estate. The statute, section 91-1405, is clear, specific and controlling. It declares and establishes the *public policy* of this state on this feature of this proceeding.

R.C.M. 1947, § 91-1405, so far as pertinent here, reads:

"91-1405. (10072) *Who are incompetent to act as administrators.* No person is competent or entitled to serve as administrator or administratrix who is: * * *

"2. *Not a bona fide resident of the state;* but if a person otherwise entitled to serve is not a resident of the state, and either the husband, wife, or child, or parent, or brother, or

sister of the deceased, he may request the court or judge to appoint a resident of the state to serve as administrator, and such person may be appointed, *but no other nonresident than a surviving husband, wife, or child, or parent, or brother, or sister shall have such right to request an appointment,* and the court or judge must order letters issued to the applicant entitled thereto under the provisions of this chapter." Emphasis supplied.

The joint "Request for Appointment of Administrator" signed and filed by Harry McGee and Edyth M. Brown, the non-resident reputed cousins of Mabel French, deceased, was and is contrary to the express public policy of this state; it is contrary to the express provisions of section 91-1405, subd. 2, supra, and it is wholly unauthorized, null and void. Such joint request is obviously evasive and misleading. It was and is confusing to the judge of the district court and to the justices of this court. It needlessly encumbers the record of both the trial and the appellate court. It should be ordered stricken from the records and files of the district court as being against established public policy and as void *ab initio*.

Frank Quinn's petition for the issuance to him of letters of administration, grounded as it was upon the above void, joint request gave the petitioner Quinn no rights nor standing to either institute or to prosecute these probate proceedings and his petition for letters of administration should be ordered stricken from the records and files of the district court notwithstanding the fact that at the conclusion of the second and final hearing herein held on November 1, 1957, the trial judge, in open court, granted the oral motion of Quinn's counsel to *withdraw* the latter's frivolous and sham petition for letters.

*Wills of Mabel French.* On the outside of the blue linen envelope containing the five written instruments *"filed simultaneously"* with Frank Quinn's petition for letters of administration. is the following pen and ink longhand script endorsement, viz:

"Wills of Mabel French
Received at 11:15 A.M.
July 18, 1957"

The five original writings so filed in the blue envelope are marked as Exhibits No. 1, 2, 3, 4 and 5 herein.

*1951 Will — Exhibit No. 1.* The earliest document is the 1951 holograph marked Exhibit No. 1. It was wholly written by the hand of Mabel French, in ordinary longhand script with a pen and blue ink on a single sheet of plain white letter-size paper. It is in the following words and figures:

The above is *one way* of making a will. See R.C.M. 1947, § 91-108. It is the do it altogether by yourself *way*. It is the simplest form in which a will may be expressed. It requires no witness. It may be made anywhere, either in or out of this state. It may be expressed in its maker's own words. It need not follow any particular form. It does not require the services of any lawyer in its drafting hence there is no outlay of any money for attorney's fees required or resulting from its making. It is an inexpensive *way* of making one's will.

*Explanatory Undated Lead Pencil Note.* Written lengthwise across the back or reverse side of the single sheet of paper, on the front or obverse side whereof is written decedent's 1951 holograph, Exhibit No. 1, is an explanatory note entirely written by the hand of Mabel French with a lead pencil and in longhand script. The explanatory note is in the following words:

In her above-undated holograph, Mabel French apologetically explained that she "started to make out a will but owing to attorney's fees, tax, etc." [attendant, attaching, incident to and to be incurred in the making in such *way*, R.C.M. 1947, § 91-107] she "made it the other way for *you*" being the simple, informal, inexpensive, do it altogether by yourself *way* sanctioned by R.C.M. 1947, § 91-108, adopted and exhibited by and in her 1951 pen and ink holograph so wholly written by her own hand on the front or obverse side of Exhibit No. 1, made for Dr. Earl T. Gangner, the sole legatee, devisee and executor named therein. No person other than Dr. Gangner and the testatrix being men-

tioned in Exhibit No. 1, the concluding words of the above lead pencil holograph "for *you*" refers to and means Dr. Gangner and none other.

The above-explanatory lead pencil note evidences the fact that Mabel French considered Exhibit No. 1 to be a valid holographic will. She carefully and safely kept and preserved it in her strong box which contained her valuable papers wherein it was found immediately after her death on July 13, 1957.

*1955 Will — Exhibit No. 2.* On July 18, 1955, Mabel French made her same will in yet another *way* wherein the provisions of R.C.M. 1947, § 91-107, are controlling, when she restated. re-executed, reiterated, remade, republished, redeclared and re-affirmed her 1951 holograph by and in her 1955 witnessed will, marked Exhibit No. 2. This more recently executed document, together with her 1951 holograph, Exhibit No. 1, became and constitute Mabel French's *last will and testament.* See R.C.M. 1947, §§ 91 204, 91-117 and 91-205. The 1955 document is written on one side of a single sheet of white letter-size paper bearing at the top, the printed three line letterhead of The Butte Daily Post Newspaper. This document, Exhibit No. 2, is subscribed at the end by Mabel French, whose signature is written in longhand script with a pen and in blue ink. The name Earl T. Gangner, M.D., is twice written in the document in longhand script and in blue ink by the hand and pen of Mabel French. Beneath the signature of Mabel French and opposite the typewritten word "Witnesses" are the signatures of the two subscribing witnesses, Margaret H. Tullis and Pauline Murphy Hitt, both written with a pen and in black ink. Exhibit No. 2 is in the following words and figures, viz.:

The Butte Daily Post
THE ONLY AFTERNOON NEWSPAPER IN THE WHOLE TRADING TERRITORY

Butte, Montana
July 18, 1955.

I Mabel French of Butte, Silver Bow County, Montana, being of sound mind and memory do make, publish and declare this to be my last will, and testament to wit. First my just debts shall be paid by *Earl T Gaugner, M.H.*

‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ to whom I give, divise and bequeath all I possess, both real and personal.

Second I nominate and appoint *Earl T. Gaugner M.H* to be exector of this my last will and testament hereby revoking all forms of wills made by me.

In witness whereof I have herewith set my hand and seal this 18th day of July, 1955.

*Mabel French*

Witnesses-

*Margaret H. Tullis*
*Pauline Murphy Hitt*

*No. 15824*

No part of the 1951 holograph, Exhibit No. 1, is, in anywise or manner, either inconsistent, irreconcilable or incompatible with any part of the more recent 1955 witnessed will, Exhibit No. 2, and under the express provisions of the statutes of Montana, both of these testamentary instruments, Exhibits Nos. 1 and 2, are to be taken and construed together as one instrument. R.C.M. 1947, § 91-204. Also see sections 91-117, 91-125 and 91-205.

248

R.C.M. 1947, § 91-117 reads:

"91-117. (6990) *Republication by codicil.* The execution of a codicil, referring to a previous will, has the effect to republish the will, as modified by the codicil.

*1955 Letter of Directions. — Exhibit No. 3.* The document, marked Exhibit No. 3, is a typewritten letter of directions written on one side of a single sheet of white letter-size paper, bearing at the top, the same printed three-line letterhead of The Butte Daily Post as appears at the top of Exhibit No. 2, supra, and bearing the same date as Exhibit No. 2. This letter of directions, Exhibit No. 3, bears the longhand script signature of Mabel French. It is in the following words and figures:

𝕿𝖍𝖊 𝕭𝖚𝖙𝖙𝖊 𝕯𝖆𝖎𝖑𝖞 𝕻𝖔𝖘𝖙

THE ONLY AFTERNOON NEWSPAPER IN THE BUTTE TRADING DISTRICT

𝕭𝖚𝖙𝖙𝖊, 𝕸𝖔𝖓𝖙𝖆𝖓𝖆

𝕵uly 18, 1955.

Dr. Earl T.Gangner.-

'My burial in Hill Cemetary,Anaconda-prefer Richards Funeral Home(owing to the owner,Arlo T.Axelson.). The Finnegan Funeral Home in Anaconda can locate the family lot there for Mr.Axelson. Pallbearers,Law Risken,George McVey,Jean Jordan,Thomas Wigel, Clayton Maxwell,George Nelson, Edward Coyle, all with newspaper;J.A.Peters,Thomas Mitchell,Robert Maloney of Alder,Joe Lind, Mr.Murphy, Missoula,M.A.Bowser, Roy,Joseph L.Kelly and Daniel Nelly,Anaconda.

Those who cannot act can be used as honorary. If music"The Lord's Prayer". The estate does not amount to much,Doctor, but whatever I have I want you to have At.Stocks include American T and T,Anaconda,Wire and Cable,Sunray Oil,Sunshine Montana Power(preferred) and Canadian Pacif stocks,lot on the flat and one in Big Butte area.An strong box in breezeway here,is deed to lot on flat.At First National Bank , have a checking account- will sign a blank check for you to fill in the amount. The key to the lock box at Metals Bank is in my purse that I carry. I have planning on doing this for a long time and hope you have no trouble what soever.You should be able to open box at bank without anyone with you.

Mabel French

Official Stenographer.

No.1524
Petition-Gangner                3 for 22
Plaintiff's Ex.
                E.Rosellini

Attention is directed to Mabel French's statement in the above-writing declaring:

"The estate does not amount to much Doctor, but whatever I have I want you to have it."

*1957 Holograph — Exhibit No. 4.* The document, marked Exhibit No. 4, is a longhand script holograph written with pen and ink on both the front and reverse sides of a portion of a sheet of poor quality absorbent paper, about four inches by eight and one-half inches in size and it bears the longhand script

250

signature of Mabel French. Exhibit No. 4 is in the following words and figures:

On July 18, 1955, in the typewritten letter of directions addressed to Dr. Earl T. Gangner, marked Exhibit No. 3, it is written: "* * * prefer Richards Funeral Home (owing to the owner, Arlo T. Axelson.)"

In the holograph note of April 17, 1957, marked Exhibit No. 4, it is written: "In will I stated Richards Funeral Home — change to Whites if you like. Mabel."

Thus does Exhibit No. 4 definitely refer to and dovetail into Exhibit No. 3, under which facts the courts are bound by the legislative mandate set forth in sections 91-117, 91-204, and 91-205, supra.

*Holograph Note — Exhibit No. 5.* The document, marked Ex-

hibit No. 5 is a holograph written in ordinary longhand script, with pen and in blue ink, on one side of a single sheet of plain white letter-size paper. It bears the signature of Mabel French, and is in the following words:

The words ''I mentioned * * * where funeral on other note

to you'' in Exhibit No. 5, point, refer and tie to decedent's holograph of April 17, 1957, Exhibit No. 4, wherein she wrote ''In will I stated Richards Funeral Home — change to Whites if you like.''

Mabel French's holograph of April 17, 1957, Exhibit No. 4 was written less than three months before her death on July 13, 1957.

It follows that Mabel French's holograph Exhibit No. 5, addressed to Dr. Gangner, the executor named and appointed in both of decedent's wills, was written on a date not earlier than April 17, 1957, the date *given* in Exhibit No. 4 and not later than July 13, 1957, the date whereon Miss French died.

In Exhibit No. 5, Mabel French wrote her named executor, Dr. Gangner, as to the payment of her funeral expenses, thus: ''I want that all to come out of the group insurance with the paper which is marked to go to estate.'' Here again holograph, Exhibit No. 5, ties into holograph, Exhibit No. 4, wherein Mabel French wrote ''April 17, 1957 This group insurance goes to my estate E. T. Gangner, M.D. Signed Mabel French''.

In 1951, Mabel French commenced preparing for her greatest adventure since her birth. She set about getting her house in order. She began the writing of her instructions to be followed by others after she had crossed the Great Divide.

The first chapter in her *book of intention and instructions* was produced when she wrote and then placed in her ''strong box'' her 1951 holograph, Exhibit No. 1.

The second and third chapters in her *book of intention and instructions* were written on July 18, 1955, when she made, declared, published and signed her 1955 witnessed will, Exhibit No. 2, and her typed letter of instructions, Exhibit No. 3, addressed to Dr. Earl T. Gangner, the named executor of her will.

The fourth chapter in her *book of intention and instructions* was added on April 17, 1957, when she wrote her holograph of that date, Exhibit No. 4.

The fifth and final chapter in her *book of intention and instructions* came with the writing of her final holograph, Exhibit No. 5, addressed to Dr. Gangner, the named executor of her will, instructing him, *inter alia,* to pay the expenses of her funeral "out of the group insurance with the paper."

Each and all of these documents, Exhibits Nos. 1, 2, 3, 4 and 5, which Mabel French safely kept *together* and preserved in her "strong box", are to be taken and construed *together* as different chapters of her one *book of intention and instructions* which *book* evidences the positive, persistent and unfaltering intent of Mabel French, commencing in 1951 and ending in 1957, to nominate and appoint Dr. Gangner to be the executor of her will and to give, devise and bequeath to him all property possessed by her at the time of her death.

*Dr. Gangner's Petition for Probate of 1955 Witnessed Will.* On July 26, 1957, Dr. Earl T. Gangner, filed in this probate proceeding in the district court, a petition wherein he "objects to the granting of Letters of Administration to the said Frank Quinn, and requests that the said [Quinn's] Petition for Letters of Administration be dismissed", and wherein he requests that the above-quoted witnessed document, Exhibit No. 2, herein, bearing date of July 18, 1955, be admitted to probate as decedent's last will and testament and that letters testamentary be issued to the proponent, Earl T. Gangner, herein.

In his above petition, the proponent, Dr. Gangner, in part alleged:

"That said deceased left an instrument purporting to be her Last Will and Testament bearing the date of July 18th, 1955, and that said instrument together with a note executed on the said 18th day of July 1955, addressed to your Petitioner herein, was found in the possession and among the effects of said decedent following her death and that your Petitioner believes and therefore alleges the said instrument to be the decedent's Last Will and Testament and is herewith presented to the above Probate Court."

*Orders Appointing Time for Hearing Petitions.* By two separate orders the district court ordered that the petition of the proponent, Dr. Earl T. Gangner, for the issuance to him of letters testamentary be heard on "the 9th day of August 1957, at 9:30 o'clock A.M.", and that Frank Quinn's petition for the issuance to him of letters of administration be heard on the same date, but "at 10 o'clock A.M." of that day.

*Opposition and Contest.* On August 5, 1957, counsel for Edyth M. Brown, subscribed her name to, and then personally verified on her behalf, a pleading designated as "Heir's Opposition to Admission of Purported Will or Wills to Probate" which was filed on August 6, 1957. This pleading consists of four separately numbered paragraphs followed by a prayer for relief and a verification. This pleading must conform to the established rules of pleading and to the requirements of R.C.M. 1947, § 91-901, which provides that the contestant "must file written grounds of opposition to the probate" of the will or wills challenged.

In the third paragraph of her pleading the contestant, as grounds of her opposition to the probate of the 1951 holograph, Exhibit No. 1, alleged that, "said document does not meet the statutory requirement for a holographic will in that *it is undated,* and, further, writing thereon in what is apparently deceased's hand indicates that *she did not consider it to be a valid will;* that this document does not meet the requirements of section 91-108, R.C.M. 1947, defining holographic wills."

Also in the third paragraph of her pleading the contestant, as grounds of her opposition to the probate of the 1955 witnessed will, Exhibit No. 2, alleged that, "the said document does not meet the statutory requirement for a written will in that *it is completely devoid of an attestation clause.*" Emphasis supplied.

*Improper Objections and Grounds of Opposition.* The prayer for relief, which follows the fourth and last paragraph of Edyth M. Brown's above pleading, reads as follows:

"Wherefore, the contestant, Edyth M. Brown, prays that the

Court deny admission to probate of any documents purporting to be the will or wills of the deceased, Mabel French, and that the petition of the said E. T. Gangner, M. D., for issuance to him of Letters Testamentary be denied; *further that the said E. T. Gangner, M. D., is not eligible to receive letters testamentary upon the ground and for the reason that the said petitioner, E. T. Gangner, has been convicted of an infamous crime and is disqualified under the provisions of section 91-1302(2), R.C.M. 1947.*" Emphasis supplied.

The established rules of pleading do not permit the pleader to add, insert or plead in the prayer of his pleading any such after thoughts as the above-italicized portion of the contestant's prayer. Any and all such allegations, charges and accusations are of no avail and must be disregarded.

It has long been the well-established law in this jurisdiction that "the prayer is no part of the pleading or cause of action stated, and cannot enlarge the relief sought by the allegations of the complaint [Citing cases.] and, in so far as the prayer is broader than the allegations of the complaint, it must be disregarded [Citing cases.]" Murray v. Creese, 80 Mont. 453, at page 459, 260 P. 1051, at page 1054.

Under the above decision and the authorities therein cited, it is quite plain that the above-quoted allegations, with which the contestant, Edyth M. Brown, concluded the prayer to her pleading, should be wholly disregarded and ordered stricken forthwith.

*First Hearing — August 9, 1957.* At 9:30 o'clock on the morning of August 9, 1957, being the time theretofore appointed by the court "as the time for proving the Last Will and Testament of Mabel French, Deceased, and hearing the application of Earl T. Gangner, M. D. for letters Testamentary" the petition of the proponent, Dr. Gangner, — the petition of Frank Quinn and the opposition and contest of Edyth M. Brown, in probate proceeding No. 15824, came on for hearing in the district court.

The proponent, Dr. Earl T. Gangner, was present in person

and was also there represented by his counsel, W. E. Coyle, Esq., and Lewis F. Rotering, Esq.

The then sole objector and contestant, Edyth M. Brown, *was not present in person,* but was represented by her counsel, John H. Risken, Esq.

The petitioner for letters of administration, Frank Quinn, was present in person and represented by his counsel, John H. Risken, Esq.

Also present were Emmett Kelly, the public administrator of Silver Bow County and his counsel, Thomas F. Kiely, Esq., who at the commencement of the hearing appeared to be innocent onlookers and bystanders.

At the outset of the hearing, counsel for the proponent, Dr. Gangner, called to the court's attention the fact that under the controlling Montana statute (R.C.M. 1947, § 91-1405) the petitioners, Harry McGee and Edyth Brown (being nonresidents of Montana and but reputed cousins of the deceased), have no authority or power to appoint or request the court to appoint an administrator of this estate.

*Testimony of Frank Quinn.* Frank Quinn was called as a witness on behalf of the proponent, Dr. Earl T. Gangner. On his direct examination by Attorney Coyle, the witness Quinn testified:

That he is a newswriter working at the Post Standard; that in 1929, Mabel French began working on the Post Standard and that the witness had continuously known her from then until her death; that she was society editor of the Montana Standard and that the witness considered her a capable editor; that the witness was a pallbearer at Mabel French's funeral; that following her death, on July 13, 1957, the witness accompanied by Mr. Chazer, the deputy county coroner and Mrs. Jones, the landlady at the Tripp and Dragstedt Apartments where Mabel French had an apartment, searched such apartment and therein found decedent's strong box which contained each and all of the above-mentioned five written instruments marked as the proponent

Gangner's Exhibits Nos. 1, 2, 3, 4 and 5 herein; that in company with Mrs. Brown, Mr. McGee Mr. Risken, and the attorney for the Metals Bank at Butte, plus an employee of the bank, the witness inspected the contents of decedent's safety deposit box at such bank and that they failed to find therein any document that purported to be the last will and testament of the deceased.

The witness Frank Quinn, was then taken on cross examination by Attorney Risken, who propounded but eight questions to the witness, one of which was put and answered thus:

"Q. (By Mr. Risken) Was your association on the newspaper a close association? A. Oh, I just saw her every day and talked to her."

On his redirect examination this witness testified:

"Q. (By Mr. Coyle) Let me ask you this, Mr. Quinn, Were you acquainted with the fact that shortly before Mabel French's death she had a couple of cataracts removed? A. Yes.

"Q. You know she had them removed? A. Yes.

"Q. That while she was in Missoula, she contracted the flu or a slight case of pneumonia and you knew that? A. I think it was when she came home.

"Q. But she did have some physical ailments that nobody could notice? A. Yes."

On the date appointed by the court for the above hearing, Margaret H. Tullis, also known as Mrs. Jim Tullis, was the one and only subscribing witness to the 1955 witnessed will, Exhibit No. 2, then within the State of Montana, the other subscribing witness, Mrs. Pauline Murphy Hitt, then being and residing at Powder River in the State of Wyoming.

*The Missing Witness.* At 9:30 a.m. on the morning of August 9, 1957, being the precise time appointed by the trial court for the hearing to begin, the subscribing witness, Margaret H. Tullis, sprang a most disturbing surprise upon the proponent and his counsel by calling Attorney Coyle, and telling him that she wasn't feeling well enough to come up to the hearing. As soon

as he had concluded his examination of the witness Quinn, Attorney Coyle, in open court, informed the trial court and the parties and their counsel of his unfortunate predicament and requested a continuance by reason thereof, informing the court that the assets of the estate would not be endangered or lost as the property had all been "picked up and nobody is bothering" it.

Thereupon, the trial judge invited Attorney Risken to proceed with the intoduction of any evidence that he had, but said counsel declined to proceed with his proof, the record thereon being as follows:

"The Court: You can put on any evidence you wish now.

"Mr. Risken: If the court is going to grant a continuation, I will reserve my evidence until such time as the court is going to convene. In that regard, in the bank there are stocks and I believe those stocks are subject to depreciation. In going through the personal effects in the safety box, we note, for instance, one certificate for twenty-five shares of American Telephone & Telegraph, and, at that time, $175 per share, and it is going down to $173 per share. There is a depreciation in the estate of $50 right there.

"I would suggest to the court that a Special Administrator be appointed in the form of Mr. Kelly. He has a bond and is present and represented in court by counsel.

"I think counsel would be willing to file—(interrupted)

"Mr. Coyle: Your Honor, there have been four or five attempts to fleece the estate already, and he is trying to tell us that the property isn't safe because of the depreciated value. If your Honor wants to give Kiely and Kelly a fee, it's all right with me.

"Mr. Kiely: I have letters of special administration ready for Emmett Kelly, your Honor. In view of the delay—(interrupted)

"Mr. Risken: It's common stock.

"The Court: The court directs the filing of the petition by the Public Administrator. Proceed.

"Mr. Kiely: We will call the petitioner, Emmett Kelly.

"The Court: Very well."

*Simple Solution.* With Frank Quinn's testimony completed and before the court all that was required to entitle Mabel French's 1955 witnessed will, Exhibit No. 2, to be admitted to probate was the testimony of the indisposed subscribing witness, Mrs. Tullis.

This situation could have been met and handled, precisely as it was handled in the subsequent hearing held on November 1, 1957, where a regularly scheduled morning hearing was recessed at 10:10 A.M. and then continued until 2:00 P.M. that same day, to enable the production in court of this same subscribing witness, Mrs. Tullis.

Both subpoenas and bench warrants were available and, if for any good and sufficient reason, the witness could not attend upon the court, the trial judges have been known to meet such emergency and adjust themselves to the situation by adjourning to the presence of the ailing witness, and there, with the court reporter, the parties involved and their counsel present, hearing and reducing to writing, the testimony of the subscribing witnesses so necessary to entitle the witnessed will to be admitted to probate.

The solution is not adjournment of the hearing for almost three months,—the appointment of the public administrator,—the issuance to this public administrator of letters of special administration and the ouster of the executor nominated and appointed by the testatrix in her last will and testament.

*Kelly Was Ready.* At the conclusion of Frank Quinn's testimony given at the August 9th hearing, Emmett Kelly and his counsel stepped out of their role as mere onlookers and bystanders by seizing upon the opportunity and excuse supplied by the failure of the subscribing witness, Mrs. Tullis, to show up for the hearing and then and there stepping forward in

open court and exhibiting and presenting to the trial judge, without any previous notice of any kind, Emmett Kelly's already prepared "Petition for Letters of Special Administration" which had theretofore been signed by both the petitioner Kelly and by his counsel. As soon as such petition was produced in court, the trial judge *directed* the filing of the petition wherein the petitioner Kelly alleged and represented, *inter alia:*

"That the value and character of said property so far as known to your Petitioner is as follows: real property consisting of Lots Six (6) and Seven (7), Block Ten (10) Big Butte Addition to the City of Butte, Montana, value unknown; miscellaneous items of jewelry, value unknown; various stocks in different corporations and two (2) Government bonds; personal effects and clothing; that the value of said stocks and bonds as your Petitioner is advised and believes, and therefore alleges, is approximately $15,000. * * *

"That in view of the objections to probate of said purported will or wills, that there shall be a delay in the administration of said estate; that all of the known heirs of said decedent cedent consists of property of such a nature that it will be lost, wasted, or depreciated in value unless cared for and administered upon at once; that your Petitioner is advised and believes, and therefore alleges, that dividend checks have or will be payable on the corporate stocks owned by decedent, and that there is the possibility that some of said shares should be sold due to a declining market and in order to preserve values for those interested in said estate.

"Wherefore, your Petitioner prays that after hearing upon this petition that Letters of Special Administration may be issued to your Petitioner, and that notice of said hearing be dispensed with as provided by law.

"Emmett Kelly, Petitioner

"Thomas F. Kiely, Attorney for

Petitioner

"Filed: Aug. 9, 1957".

Immediately upon *directing* the filing of the foregoing petition, the trial judge proceeded to hear the testimony of the petitioner Kelly who testified as follows, viz.:

Emmet Kelly Testifies:

Direct Examination

By Mr. Thomas F. Kiely:

"Q. State your name, please? A. Emmett Kelly.

"Mr. Coyle: Before proceeding further, I would like to make a formal objection for the record.

"The Court: Proceed.

"Mr. Coyle: Comes now the Petitioner, E. T. Gangner, and objects to the appointment of Emmett Kelly or any other person as special administrator in this estate on the grounds and for the reasons that the stocks and bonds in the bank are what we call 'blue chip' stocks; and further, we feel that, in the state of the record, any appointment of a special administrator at this time would only serve one purpose, and that would be to take out of the estate an administrator's fee and the attorney's fee.

"The Court: The objection is overruled. Proceed.

\*  \*  \*  \*  \*  \*  \*

"Q. Mabel French died on or about the 13th day of July, 1957, in the City of Butte, County of Silver Bow, State of Montana, is that right? A. Yes.

"Q. At the time of her death did you know she was a resident of Silver Bow County, Montana? A. Yes.

"Q. Have you been advised that she left an estate in Silver Bow County, Montana? A. Yes, I have.

"Q. Did that estate consist of certain real property consisting of Lots 6 & 7 in Block 10 of the Big Butte Addition to the City of Butte? A. Yes. \*  \*  \*

"Q. Were you also advised that she left certain miscellaneous items of jewelry, which are in the safety deposit box, and the value of which is also known to you at this time? A. Yes.

"Q. Were you advised that she left various shares of stock in various corporations, and two government bonds? A. Yes.

"Q. Were you advised that the value of those stocks is $15,000.00? A. Yes.

"Q. And that the gross value of the estate is probably in the amount of $25,000.00? A. That is what I understand.

"Q. Mabel French left surviving her as next of kin, whom you believe are her heirs at law:

"Harry McGee, Route 1, Oaksdale, Washington;

"Edyth M. Brown, 722 East 7th St., Cheney, Washington;

"Gene McGee, Spokane, Washington;

"Raymond McGee, Wenatchee, Washington; and

"Lloyd McGee, Vancouver, Washington? A. That's right.

"Q. And all of those persons are residing without the State of Montana? A. Yes.

"Q. Were you also advised that there is on file and before the Court at the present time the petition of E. T. Gangner for letters testamentary and for admission to probate of said estate the last will and testament of Mabel French, deceased? A. Yes.

"Q. Were you also advised that one of the heirs has filed an objection to the probate of this will? A. Yes.

"Q. You were in Court and present this morning and heard counsel for the proponent move for the continuance of this matter for, probably, three weeks, is that correct, Mr. Kelly? A. Yes.

"Q. Should you feel, perhaps that this stock would depreciate in value, and there are dividends on this stock, which you have been advised, have been paid to her; and there is no person in authority at the present time to col-

lect these dividends? A. Yes. That is what I have been advised.

"Q. As Public Administrator, you are present in Court at this time to be appointed Special Administrator of this estate? A. Yes.

"Mr. Kiely: That is all, thank you.

"Mr. Risken: No questions at this time.

"Mr. Coyle: I have nothing to ask now."

(Witness, Mr. Emmett Kelly, Excused.)

"Mr. Coyle: Let the record show that the petitioner, E. T. Gangner, through his attorney, who is the sole devisee and legatee in this will, objects to the selling of these stocks.

"The Court: The matter of the petition of the Public Administrator is approved. and it is ordered that Letters of Administration issue to the Public Administrator upon his taking the oath and upon his official bond—Special Letters of Administration.

"The application of counsel for Mr. Quinn for postponement is taken under advisement.

"Mr. Risken: Your Honor, that was counsel for Dr. E. T. Gangner.

"The Court: The application of counsel for Dr. E. T. Gangner for postponement is taken under advisement. The case is recessed indefinitely.

" (Whereupon the trial of this cause was recessed indefinitely on August 9th, 1957, to continue again on November 1st, 1957.) "

Thereupon on August 9, 1957, Emmett Kelly took and subscribed the statutory oath and letters of special administration of the estate were that day issued to him.

*Kelly's Barrage.* Emmett Kelly, the public administrator of Silver Bow County pursued the following procedure and peppered the proponent with the following papers herein, viz.:

1. On August 8, 1957, the day before the initial hearing

in these proceedings, Kelly verified his typewritten pleading designated "Objections to Petition of Frank Quinn for Letters of Administration";

2. Also on August 8, 1957, Kelly signed his typewritten "Petition for Letters of Administration" bearing that date;

3. On August 9, 1957, Kelly presented and filed his "Petition for Letters of Special Administration";

4. On August 10, 1957, Kelly filed his verified typewritten "Objections to Petition of Frank Quinn for Letters of Administration";

5. Also on August 10, 1957, Kelly filed his verified typewritten "Objections to Petition of E. T. Gangner for Letters Testamentary"; and

6. On August 20, 1957, Kelly filed in the trial court his above-mentioned "Petition for Letters of Administration" dated August 8, 1957, seeking letters of general Administration or letters of administration with the will annexed, the concluding paragraph of such petition and the prayer thereto reading as follows:

"That your Petitioner is the duly elected, qualified and acting Public Administrator of Silver Bow County, Montana, and that all of the known heirs-at-law of Decedent reside without the State of Montana, as hereinbefore alleged, and that the Estate of Decedent consists of property of such a nature that it will be lost, wasted, or depreciated in value, unless cared for and administered upon at once; that as hereinbefore alleged, a portion of the assets of said estate consists of corporate stocks upon which dividends are, or will be, payable, and it may be necessary to sell such stocks in order to preserve the value of said estate, in view of a declining market.

"Wherefore, your Petitioner prays that a day of Court be appointed for hearing this Petition, that due Notice be given by the Clerk of said Court by posting Notices according to law and that the Petition of said Frank Quinn for Letters of Administration and the Petition of said E. T. Gangner for Let-

ters Testamentary and Probate of Will be, and each of them, be continued to the same date set for hearing of this petition, and that upon the hearing of said Three (3) petitions that proof be adduced, and Letters of Administration of said estate issued to your Petitioner, as Public Administrator of said Silver Bow County, Montana, and that in the event said will or wills be admitted to probate and said E. T. Gangner determined to be uneligible to act as executor thereof, that your petitioner be appointed administrator with will annexed herein.

"Dated at Butte, Montana, this 8th day of August, 1957.

"Emmett Kelly, Petitioner.

"Thomas F. Kiely, Attorney for Petitioner.

"Filed: August 20, 1957."

*Second Hearing—November 1, 1957.* On November 1, 1957, the following matters in probate proceeding No. 15824 came on for hearing before the Honorable John B. McClernan, district judge presiding, viz.:

(a) Frank Quinn's petition for the issuance to him of letters of administration;

(b) The request by Edyth M. Brown and Harry McGee that Frank Quinn be appointed administrator;

(c) Emmett Kelly's "Objections" to Frank Quinn's petition for issuance to Quinn of letters of administration;

(d) Earl T. Gangner's petition for admission to probate of decedent's witnessed will, Exhibit No. 2, bearing date of July 18, 1955, and for the issuance to Dr. Gangner of letters testamentary;

(e) Edyth M. Brown's opposition, objections and contest to the granting of Dr. Gangner's above petition;

(f) Emmett Kelly's objections to Dr. Gangner's above petition; and

(g) Emmett Kelly's petition for appointment as administrator with the will annexed.

At the hearing ordered for 10:00 A.M. on November 1, 1957, the petitioner, Harry McGee, *was neither present nor repre-*

*sented by counsel;* the objector and contestant, Edyth M. Brown *was not present in person,* but was represented by her counsel, John H. Risken, Esq.; the proponent, Dr. Earl T. Gangner, *was not present in person,* but was represented by his counsel, W. E. Coyle, and Lewis F. Rotering, Esq.; the petitioner, Frank Quinn, was present in person and represented by his counsel, John H. Risken, Esq.; and Emmett Kelly, the combination public administrator,—appointee holding special letters of administration,—objector,—contestant and petitioner for both letters of general administration and for letters of administration with will annexed, was present in person and by his counsel, Thomas F. Kiely, Esq.

*Subscribing Witness Absent.* Again the subscribing witness, Margaret H. Tullis, failed to appear in court at the time ordered for the hearing and counsel for the objectors, contestants and petitioners, other than counsel for the proponent, Dr. Gangner, declined to proceed with the introduction of any evidence in support of their various contentions, whereupon, at 10:10 A.M. the court recessed to continue with the hearing at 2:00 P.M. that same day.

*Testimony of Margaret H. Tullis.* At the appointed hour on the afternoon of November 1, 1957, the hearing was resumed and Mrs. Margaret H. Tullis, the subscribing witness to Exhibit No. 2, called as a witness on behalf of the proponent, Dr. Earl T. Gangner, took the witness stand and on direct examination by the proponent's counsel, W. E. Coyle, Esq., testified as follows:

"Q. You may state your name to the Court, please? A. Mrs. Margaret Tullis.

"Q. And where do you reside, Mrs. Tullis? A. At the Tripp & Dragstedt Apartments.

"Q. And that is in the City of Butte, County of Silver Bow, State of Montana? A. That's right, yes.

"Q. And how long have you been a resident of Butte. Montana? A. Oh, about thirty eight years this time.

"Q. You are a widow are you, Mrs. Tullis? A. Yes.

"Q. You were married to James Tullis who was an insurance and businessman in this community for many years? A. Yes.

"Q. Were you acquainted with one, Mabel French, in her lifetime? A. Well, not her whole lifetime, but for many years, yes.

"Q. And for how long a period of time did you know Mabel French? A. Oh, personally, about—about fourteen or fifteen years. She lived at the Thornton Hotel when we lived there about thirty years ago.

"Q. I see; and were you and she intimate friends, Mrs. Tullis? A. Yes, up to two years ago.

"Q. I see; you considered her as an intimate friend; in other words she visited your place and you visited hers? A. That's right, yes.

"Q. And she was well acquainted with your husband in his lifetime, too? A. Yes.

"Q. And did you know what Mabel French did for a living, what occupation or profession she followed, Mrs. Tullis? A. Why, yes. She was the society reporter for the Standard.

"Q. I see; and was she the society editor at the Montana Standard during all of the time that she was at the Tripp & Dragstedt? A. Yes.

"Q. And you lived there for how long yourself. Mrs. Tullis? A. Well, three years about the 25th of August.

"Q. Now, Mrs. Tullis, calling your attention to Petitioner's Exhibit No. 2 for Identification, I will ask you to read that instrument and look it over and tell me whether you have ever seen it before? (Handing paper to witness). A. Well, the only thing that I have seen, witnessed, was Mabel's signature. This is Mabel's signature (indicating on paper); this is my signature (indicating on paper) and this is my niece's signature (indicating on

paper); and that's all I know. I don't know anything about the rest.

"Q. You don't know anything about the contents of the Will? A. No. I didn't look at that. I just witnessed her signature.

"Q. And where was it witnessed, in your apartment? A. In my apartment.

"Q. And she came to your apartment, did she? A. Well, I will tell you, after Mr. Tullis passed so sudden, I was taken quite ill and had just got home from the hospital a week and she was sort of worried and felt like she should have a Will; and she brought that in, and my daughter and my niece was up and she witnessed it with me.

"Q. I see; and did she ask you to witness her Will? A. Oh, yes.

"Q. She came into your apartment and did that? A. That's right.

"Q. And was—(interrupted). A. And this I do know: This was blank (indicating on paper). I know that. There was nothing on there, no signature. Only her signature, I witnessed that. She signed that in front of Pauline and myself.

"Q. And by Pauline—Murphy Kitt, is it, or Hitt? A. That's right—Hitt.

"Q. And where did she live? A. She lives at Powder River, but she come up and was staying with me a week Powder River, Wyoming.

"Q. I see;—(interrupted) A. She just happened to be in my apartment.

"Q. —just at that time, she happened to be in your apartment? A. Yes.

"Q. And the instrument bears July 18th, 1955, would you say that's (interrupted) A. That's about right.

"Q. —that's about the date? A. Yes.

"Q. Now, can you fix, if you can, Mrs. Tullis, whether you knew about that time where she had been; did you know that she had been out of town and just recently returned, or what is your recollection of that? A. Oh, I don't know anything about that. All I know is: She was working.

"Q. I see, but do you recall whether she had just come from Lewistown, Montana? A. No.

"Q. You don't, you haven't any independent recollection on that? A. No.

"Q. But she did come into your apartment— A. That's right.

"Q. —and she asked you if you would witness her will and she signed her name? A. That's right.

"Q. In your presence and in the presence of your niece? A. Yes.

"Q. And you, at her request, witnessed it, and you signed in her presence and in the presence of each other? A. That's right.

"Q. Now, let me ask you this: Mrs. Tullis, are you familiar with and have you seen the signature of Mabel French? A. Oh, yes.

"Q. And have you seen it on more than one occasion? A. On her checks when I have been out with her when she signed her checks.

"Q. I will hand you what is Petitioner's Exhibit 5 for Identification and ask you to look at the bottom of the instrument where the name Mabel French is, and will ask you whether that is Mabel French's handwriting? (handing paper to witness). A. Well, it looks like it.

"Q. It looks like hers? A. It's different, well, of course, she was in a hurry with this.

"Q. Would you say it was her handwriting? A. Well, I am pretty sure I would.

"Q. Now, I hand you Petitioner's Exhibit No. 3 for

270

Identification, which is a typewritten instrument dated July 18th, 1955, and ask you to look at that signature, could you tell me whether that is? (Handing paper to witness). A. Yes, that's hers.

"Q. Now, I hand you Plaintiff's Exhibit No. 1 for Identification, and upon the bottom of the instrument, why, there is a signature there, and I will ask you whether that is Mabel French's signature? (Handing paper to witness.) A. Yes.

"Q. It is? A. It is.

"Q. Now, I will hand you Petitioner's Exhibit No. 4 for Identification and ask you to look at that instrument and tell us if that is Mabel French's signature? (Handing paper to witness). A. Well, it looks like the rest.

"Q. Would you say it is? A. It looks like the rest. Let me see the one that I witnessed, will you please?

"Q. Yes, Ma'am. (Handing paper to witness).

"Mr. Coyle: Yes, Ma'am. May the record show that the witness is looking at Petitioner's Exhibit No. 2 for Identification, and comparing it with Exhibit No. 4, I believe it is? A. Yes.

"Q. Now, Mrs. Tullis, after making the comparison, what have you to say as to the signature on Plaintiff's Exhibit No. 4 for Identification being Mabel French's signature? A. Yes.

"Mr. Coyle: We offer in evidence Petitioner's Exhibit Numbers 1 to 5, inclusive.

"Mr. Risken: May we examine them, your Honor.

"The Court: You may. (Whereupon Petitioner's Exhibits Numbers 1 to 5, inclusive, were examined by Mr. Risken and by Mr. Kiely.)

"Q. (By Mr. Coyle) Mrs. Tullis, calling your attention back to July 18, 1955, which is the date that the instrument you witnessed indicates it was signed on that particular day, had you seen Mabel French much previous

to that occasion—I mean immediately before? A. Well, I was in the hospital for about—oh, twelve days, but pretty near every day up to then, but not after.

"Q. Not after July the 18th, 1955? A. Well, now let me see * * * . It could have been.

"Q. But prior to July the 18th, 1955, you saw her, except when you were in the hospital, almost every day? A. Most every day.

"Q. And did you visit with her? A. Oh, yes, we visited every day up to two years ago. Over two, now.

"Q. And July 18th, 1957, would be two years from the date of the signing of the instrument; did you in your discussions — I don't want to know what they were, or anything — did you discuss various subjects and certain people? A. Oh, no, we just —

"Q. Talked like most women do? A. Well, most men, too. We just talked.

"Q. And how did she appear in her conversations? Did she appear to be a normal person? A. Definitely.

"Q. You would say that she was on July the 18th, 1955? A. Yes.

"Q. And you noticed no change in her condition on July 18th, 1955, I mean from a mental standpoint during any more — or withdraw that, please. You did not notice any change in her mental condition on July 18th, 1955, as compared to any other day during that year, did you? A. No.

"Mr. Coyle: That is all."

Cross Examination by Mr. John H. Risken.

"Q. Now, Mrs. Tullis, handing you what has been marked for identification as Petitioner's Exhibit No. 2, that is the instrument which you signed, is it not? A. That's right.

"Q. You stated in your previous testimony that there were certain blanks in that instrument at the time you signed it? A. That's right.

"Q. Now, would you point out on this instrument which

272

I hand you which of those were blank? A. They were all blank except Mabel signed this, we witnessed it, there were no other signatures.

"Q. The wording that is in pencil or pen — (Reading) 'Earl T. Gangner M.D.' — (interrupted) A. Now.

"Q. — was it there at that time? A. No.

"Q. Was it there on either of the blanks, on lines one — (interrupted) A. Oh, no.

"Q. I am referring to line 3 (indicating) for the first blank — (interrupted) A. That's right. It was a blank. She wouldn't put that in there and let me see it anyway. Anyway, I wouldn't look for it because it wasn't my business, and they were both blanks. * * *

"Q. Mrs. Tullis, the instrument Petitioner's Exhibit No. 2 for identification — you didn't read the instrument? A. Oh, no.

"Q. And you just took her word that that was her last Will and Testament when she asked you to sign, you, however, are quite sure that neither up here nor down there, that these names appeared at the time — (interrupted). A. That's right.

"Q. — that you witnessed the instrument? A. That's right.

"Q. You did not then, however, look at the instrument. A. Oh, I did not look at the — I looked at the blanks, you know, like you would, while she was filling in her signature, but I didn't read it. there were no names here (indicating) —

"Q. No names? A. They were blanks.

"Q. I see; and — (interrupted) A. And another thing I did know: She went to Lewistown, but I don't know the dates or anything of that.

"Q. I see; you don't know whether she just came back at that time or not? A. No, because — (Witness does not finish.)

"Mr. Coyle: I believe that is all, Mrs. Tullis, thank you.

"The Court: Are you finished with Mrs. Tullis at this time?

"Mr. Risken: Yes, your Honor.

"The Court: Very well, you are excused, Mrs. Tullis."

At the conclusion of her testimony on her direct, cross and re-direct examination the witness, Margaret H. Tullis. was excused and thereupon counsel for the proponent, Dr. Gangner, rested proponent's case as follows:

"Mr. Coyle: If the Court please, we are offering all of Petitioner's Exhibits Numbers 1 to 5 in evidence for this purpose as well as for the purpose of the *Will to show the intent of the Testatrix, as all of these instruments show that the intent of the Testatrix was to leave all of her property, both real and personal to Dr. Gangner.* * * *

"The Court: Now, gentlemen, as far as offering these in evidence is concerned. *they are all received in evidence,* but which, if any, is going to be admitted to probate, I don't know. *They are all received in evidence for consideration.*

"Petitioner's Exhibit No. 1. Petitioner's Exhibit No. 2, Petitioner's Exhibit No. 3, Petitioner's Exhibit No. 4, and Petitioner's Exhibit No. 5, here received in evidence and are as follows. See following pages: Photocopies, Originals certified to Supreme Court." Emphasis supplied.

The receiving in evidence of the proponent's Exhibits Nos. 1, 2, 3, 4 and 5 was proper. It is authorized by the provisions of R.C.M. 1947, §§ 91-117, 91-204 and 91-205.

"The Court: You may proceed in this matter if you gentlemen have something further in this matter to present. * * *

"Mr. Coyle: Let us submit briefs on our authorities, your Honor, which wouldn't take very long.

"The Court: Very well, let's have the rest of the evidence if anybody has any more evidence. Do you rest, Mr. Coyle?

"Mr. Coyle: For the purpose of the record it is my information that Dr. E. T. Gangner *some time ago suffered a slight stroke. He is on the mend now, and within a week would be capable of handling his affairs and any affairs that would be required of him in this matter. It is impossible, however, to bring him to Court today, and probably wouldn't be possible,* if the Court deemed it necessary to bring him to Court until some time in the early part—or, not the early part, but the *latter part of next week.*

"He desires to — he expresses his intention and desire to serve, and I just want to make that point clear, it is impossible to have him here because of his physical condition today.

"With that statement, we rest."

"(Petitioner E. T. Gangner Rests)" Emphasis supplied.

Thereupon Mr. Kiely, of counsel for the petitioner, Emmett Kelly, proceeded as follows:

"Mr. Kiely: May I ask this question, Judge?

"The Court: Very well, Mr. Kiely.

"Mr. Kiely: Is it my understanding now that there will be a continued hearing at which the proponent of the Wills, Dr. Gangner, will appear and testify?

"Mr. Coyle: Well, I don't think that that's going to be necessary * * * I mean, naturally, if the Court was disposed to appoint under the Will, under Exhibit No. 2, I think it is, and Dr. Gangner is executor of the Will, we would want to know whether he is capable of serving, and the only reason that I make the statement to the Court is that my information is that he would be, but that I don't know, but, as I would understand it. it wouldn't be necessary to have Dr. Gangner here or to continue this hearing.

"The Court: The court feels a little dilatory already in permitting this estate to go as far as it is. I feel that somebody has to be appointed today to get ahead with the business of this estate.

"Mr. Coyle: Well, I am not asking for any continuance, your Honor.

"The Court: *And the Court will assume that Dr. Gangner expresses his willingness to act?*

"Mr. Coyle: *Yes, that's right.*

"The Court: Proceed.

"Mr. Kiely: We will call Mr. Emmett Kelly."

Thereupon the petitioner, Emmett Kelly, was called as a witness in his own behalf and upon direct examination, by his counsel, Thomas F. Kiely, Esq., in part, testified:

That he then was the public administrator for Silver Bow County, Montana, and was then acting in the the capacity of special administrator of the estate of Mabel French, deceased;

That he had received a number of dividend checks from stocks held in the name of the decedent and also the proceeds of the group life insurance that she had at her place of employment;

That decedent owned certain real property on Harrison Avenue and also lots 6 and 7 in Block 10 of the Big Butte Addition to the City of Butte, Montana;

That according to his best information, decedent's estate approximates somewhere in the neighborhood of $25,000;

That the witness Kelly was petitioning for letters of administration in the event none of the wills theretofore filed in the proceeding are admitted to probate and that if for any reason the court should determine that the proponent E. T. Gangner named as executor, in two of decedent's wills (Exhibits Nos. 1 and 2), should not be able to act as executor, that then and in such event the witness Kelly, as public administrator, requests that he be appointed as administrator with the will annexed; that his "efforts as special administrator were merely to gather the assets together and preserve them until such a time as a general administrator or executor or administrator with will annexed was appointed for this estate."

On cross-examination by Attorney Coyle the witness Kelly, in part, testified:

That he is petitioner for the issuance to him of letters of administration in the event that none of the instruments · in writing, Exhibits Nos. 1, 2, 3, 4 and 5, are admitted to probate and that the witness claims a prior right thereto under the · statute because the nominations filed herein by the next of kin are not valid in Montana; and that if any of the Exhibits Nos. 1, 2, 3, 4 and 5 be admitted to probate as the last will and testament of the decedent, then it is the desire and request of the witness Kelly that he be appointed administrator with the will annexed.

*Petition of Quinn Withdrawn.* At the conclusion of his above testimony, the witness Kelly was excused, whereupon the following occurred:

"Mr. Risken: May it please the Court, there is also pending before the Court at this time the Petition of Frank Quinn for letters of Administration. Mr. Quinn was originally requested by the heirs to file this Petition before the Petition was filed by Mr. Kiely on behalf of Mr. Emmett Kelly, and now that he has done so we withdraw the Petition by Frank Quinn.

"Mr. Coyle: We have no objection to the withdrawal of the Petition of Mr. Quinn.

"The Court: Very well, the Petition is withdrawn.

"Mr. Risken: We are finished.

"The Court: Do I understand that there are objections here in the file to the appointment of Dr. Gangner?

"Mr. Coyle: Yes, your Honor, there are objections filed which would have no basis in fact now from Petitioner Quinn, he having dismissed his proceedings in this action. There is, however, in Mr. Kiely's Petition as I understand it.

  *   *   *   *   *   *

"Mr. Risken: * * * If it please the court, to make the

record more specific I would like it to appear that I have just withdrawn the petition of Frank Quinn for Letters of Administration and nothing else.

"Mr. Coyle: The only objection, as I see it, the question that the Court is going to pass on here is the validity of these wills, and the only objection he has got to the defendant Gangner acting, in the event that the Court would feel so disposed to appoint him, is that he was convicted of an infamous crime against nature, and I just wonder if that is the position?

"Mr. Risken: If that was the position at that time, Mr. Coyle, I can amend that by interlineation, if you so desire.

"Mr. Rotering: Well, they are withdrawing that petition, that would include that, would it not?

"Mr. Risken: I am not withdrawing anything else.

"Mr. Coyle: Well, what is your position? That he has been convicted of an infamous crime against nature?

"Mr. Risken: Yes.

"Mr. Coyle: I mean that's your objection to him?

"Mr. Risken: At that time it was, yes, *but at the present time I know that the case was remanded to the District Court for further proceedings, and that the County Attorney dismissed the proceedings.* My objection to him now, if I were allowed to amend by interlineation, would be that he is not a person of good moral character such as to administer an estate, as provided by the statute.

"Mr. Coyle: Well, you were in error on this, and I think that your amendment is coming a little late here. You alleged he was convicted of an infamous crime against nature which you should have known at the time you filed this information was not true.

"Mr. Risken: No, I didn't.

"Mr. Coyle: I mean if you had looked, you would have.

"Mr. Kiely: If the Court please, maybe I can clear up something on this. There are objections in the file, in the

file of Emmett Kelly as Public Administrator to the petition of E. T. Gangner for Letters Testamentary, but I do not feel that we would be prepared to offer any evidence in support of those objections at this time in view of the fact that the petitioner, Dr. Gangner, had not appeared in Court to testify in support of his petition.

"The Court: Well, then does everybody rest, gentlemen?

"Mr. Coyle: Yes, we rest. We would like to make * * * a memorandum of authorities for the Court to follow."

Thereupon the court allowed respective counsel additional time within which to prepare, serve and submit their respective briefs and continued Emmett Kelly, the public administrator, as special administrator of the estate.

(Whereupon the trial of this case was ended as above.)

*Minute Entry Rulings.* On January 10, 1958, the court made and caused to be entered in its Journal BF at page 594 a minute entry wherein it ruled: (1) That the 1951 holograph, Exhibit No. 1, is admitted to probate as decedent's will; (2) that the petition for letters of administration by Frank Quinn is denied; (3) that the petition of Earl T. Gangner. M.D., for the issuance to him of letters testamentary is denied; (4) that the petition of Emmett Kelly for the issuance to him of letters of administration with the will annexed is granted; (5) that an order be entered accordingly; (6) that exceptions to the court's rulings were noted by counsel for the proponent, Earl T. Gangner; and (7) that the latter be granted sixty days, in addition to time allowed by law, to serve and file a bill of exceptions.

*Court Orders of January 13, 1958.* On January 13, 1958, the trial court made, signed and caused to be filed a multiple court order, designated "Order Admitting Will to Probate And Order Appointing Emmett Kelly Administrator with the Will Annexed", wherein it ordered: (1) That Emmett Kelly's objections to Dr. Gangner's petition for letters testamentary are sustained; (2) that Emmett Kelly's petition for letters of administration is denied; (3) that Emmett Kelly's objections to Frank Quinn's

petition for letters of administration are overruled, Quinn, in open court, having withdrawn his said petition; (4) that Emmett Kelly's petition for letters of administration *cum testamento annexo* is granted; (5) that Edyth Brown's objections to Dr. Gangner's petition for letters testamentary are sustained; (6) that Edyth Brown's objections to the 1951 holograph, Exhibit No. 1, are overruled; (7) that Edyth Brown's objections to the other written instruments, being Exhibits Nos. 2, 3, 4 and 5, are sustained and all are denied probate; (8) that the 1951 holograph, Exhibit No. 1, is a holographic will and is admitted to probate as the last will and testament of decedent; and (9) that E. T. Gangner's petition for the issuance to him of letters testamentary is denied.

*Judge's Certificate.* On January 13, 1958, the trial judge made and filed his ''Certificate of Proof of Will and the Facts Found'' wherein he certified:

''That on the 10th day of January, 1958, the annexed Instrument [Exhibit No. 1] was admitted to Probate as the last Will and Testament of Mabel French, deceased, and from the proofs taken and the examination had therein, the said Court finds as follows:

''That said Mabel French died on or about the 13th day of July 1957, in the County of Silver Bow, State of Montana; that at the time of her death she was a resident of the County of Silver Bow, State of Montana, that the said annexed will [Exhibit No. 1] was duly executed by the said decedent, in her lifetime, in the County of Silver Bow aforesaid, State of Montana, and is entirely written, signed and dated in the handwriting of decedent, and is a valid holographic will; that the said decedent, at the time of executing said Will, was of the age of 57 years and upwards; was of sound and disposing mind, and not under duress, menace, fraud or undue influence, nor in any respect incompetent to devise and bequeath her estate.''

*Notice of Appeal.* On March 5, 1958, the contestant and ob-

jector, Edyth M. Brown, filed a notice of appeal from the above-mentioned multiple court rulings and orders so made and filed in the district court.

*Supreme Court's Duty.* In the case of In re Woodburn's Estate, 128 Mont. 145, at pages 150, 151, 273 P.2d 391, 393, this court said:

"An action to probate a will is a special statutory proceeding, equitable in nature, and in a review on appeal, is governed by the rules that apply in an equitable action. In re Bragg's Estate, supra [106 Mont. 132, 76 P.2d 57]; In re Minder's Estate, [128] Mont. [1], 270 P.2d 404.

"It is our duty in equity cases and in matters and proceedings of an equitable nature to 'review all questions of fact arising upon the evidence presented in the record * * * and determine the same, as well as questions of law * * *.' R.C.M. 1947, § 93-216.

"No will, fair upon its face, should be denied probate, except for good and sound reasons. The policy of our courts is to sustain a will, if it is possible to do so, and every reasonable presumption will be indulged in favor of the due execution of a will. The presumption is against intestacy. In re Bragg's Estate, supra; see also Watts v. Choate, 117 Mont. 505, 160 P.2d 492. See In re Cummings' Estate, 92 Mont. 185, 11 P.2d 968; In re Silver's Estate, 98 Mont. 141, 39 P.2d 277."

In the case of In re Minder's Estate, 128 Mont. 1, at pages 8 and 9, 270 P.2d 404, at page 408, 45 A.L.R. 898, this court said:

"*Review on Appeal.* An action to probate a will is a special statutory proceeding, equitable in nature and, in a review on appeal, is governed by the rules that apply in an equitable action.

"R.C.M. 1947, § 93-216, prescribes the duty of the supreme court when reviewing on appeal matters and proceedings of an equitable nature such as are here presented."

Section 93-216, supra, *inter alia,* provides:

"*The supreme court* may affirm, reverse, or modify any judgment or order appealed from, *and may direct the proper judgment or order to be entered,* or direct a new trial or further proceedings to be had. * * * *In equity cases, and in matters and proceedings of an equitable nature, the supreme court, shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law,* unless, for good cause, a new trial or the taking of further evidence in the court below be ordered; provided, that nothing herein shall be construed to abridge, in any manner, the powers of the supreme court in other cases." Emphasis supplied.

In In re Connolly's Estate, 79 Mont. 445, at pages 450, 451, 257 P. 418, at page 421, this court said: "The administration of estates is peculiarly within the cognizance of equity * * *. The court is not fettered by any rule of law from doing exact justice as between all parties in interest. [Citing case.] And in proceedings of an equitable nature this court will, in proper cases, review all questions of fact arising from the evidence presented by the record, and determine the same, as well as questions of law. Section 8805, R.C.M. 1921. [now R.C.M. 1947, § 93-216]." To like effect see: In re Sikorski's Estate, 127 Mont. 563, at page 571, 268 P.2d 395. Compare Shaw v. City of Kalispell, 135 Mont. 284, 290, 340 P.2d 523, 527; Roth v. Palutzke, 137 Mont. 77, 350 P.2d 358.

*Procedure and Practice.* In the case of In re Bragg's Estate, 106 Mont. 132, at pages 137-142, 76 P.2d 57, at page 60, this court said:

"In a leading California case, In re Estate of Latour, 140 Cal. 414, 73 P. 1070, 1072, 74 P. 441, it was said: 'The court should determine upon evidence introduced before it, *without the presence of the contestant,* as to the existence of all facts essential to the probate of the will,' but held that on

282

the issues raised by the contestant the burden was on him. * * *

"After reviewing the rules of the various jurisdictions pertinent to the question, Jones on Evidence, in volume 2, second edition, page 988, says: 'The usual practice is for the proponent to produce the subscribing witnesses, make formal proof of compliance with the statutory formalities, and give some proof of testamentary capacity. * * * This practice, modified in minor instances, is now becoming universal. The proceeding on a petition for probate is distinct from the proceeding on a contest of a will.'

"We think the burden was on the proponent * * * to make his prima facie case, and on all issues raised by the contestants the burden was upon them. This appears to be the general rule. It is obvious that the proponent must satisfy the court by a preliminary showing, as no occasion arises for a hearing on a contest until that is done. *We think a prima facie case is established* when the provisions of section 10030, Revised Codes, are complied with, namely, *by the testimony of one or both of the attesting witnesses as to their signatures to the will and the signature of the testator.* * * *

"We find good authority * * * to the effect that a contestant has no part in this preliminary or prima facie proof of the right to probate. * * * Bancroft on Probate Practice, volume 1, page 367, has this to say on the subject: 'The hearing on application for probate and the hearing on opposition of contest are nonetheless wholly distinct because occurring on the same day.' * * *

"It must be kept in mind that while section 6980, Revised Codes [1921, now R.C.M. 1947, § 91-107], prescribes the rules that govern the making and execution of a will, that the proof as to whether the testator has substantially complied with such rules must be made in accordance with the rules of evidence, that while two attesting witnesses are indispensable to the making of a valid will, in form such

as we have under consideration, yet *the satisfactory testimony of one witness entitles a will to probate,* (section 10-505), Id., [Revised Codes 1935, now R.C.M. 1947, § 93-401-1] * * *

"We proceed with the consideration of this appeal guided by established rules * * * as follows : In reviewing a decision of the district court it will be presumed that * * * the burden is on the party alleging error to show the error affirmatively [citing cases] but that *an action to probate a will is a special statutory proceeding, equitable in nature* [citing authority] *and, in a review on appeal, is governed by the rules that apply in an equitable action; that the* presumption is against intestacy [citing authority], and it is the policy of courts to sustain a will, if it is possible to do so [citing case] ; and every reasonable presumption will be indulged in favor of the due execution of a will [citing case] ; that statutory requirements must be clearly and fully observed [citing cases], but *the statutes of this state and 'their provisions and all proceedings under them* are to be liberally construed with a view to effect their objects and to promote justice,' (section 4, Rev.Codes [1921, now R.C.M. 1947, § 12-202] ) ; that the purpose of the statute in prescribing formalities for the execution of wills 'is to make sure that the testator is aware that he is making a will, and that he be not imposed on and procured to sign a will when he supposes it to be some other instrument.' * * *

"In construing a statute and determining its proper application and effect, this court has repeatedly held that *all that is required is that it be substantially complied with.* 'While the requirements of the statutes as to the formalities in executing a will must be scrupulously followed in all essential particulars, and with substantial precision, it has very generally been held that *substantial compliance therewith is sufficient,* especially where there is no suggestion of fraud, deception, undue influence, or mental incapacity.'

68 C.J. 651, § 276. 'Bearing in mind that the main object of such legislation is to repel fraud and establish a bona fide testament, we may assume that a substantial rather than a literal compliance with the statute formalities is sufficient.' In re Miller's Estate, 37 Mont. 545, 97 P. 934, 941.

"The California decisions are in substantial harmony with ours. 'Here we have the fact that the testatrix made her mark to the instrument, the declaration that it was her will and testament, made in the presence and hearing of the witnesses, and the fact that the witnesses subscribed the same at her request in her presence, and in the presence of each other. * * * We think this was sufficient.' In re Estate of Emart, 175 Cal. 238, 244, 165 P. 707, 710. L.R.A. 1917F, 866. All the essentials mentioned in this California case were complied with in the execution of the will involved here.

"On the evidentiary value of the attestation clause as to due execution, *no particular attestation clause is prescribed by statute,* but the clause attached to the will in the instant case is complete and that which is generally in use." Emphasis supplied.

*The 1951 Holograph, Exhibit No. 1.* The appellant has assigned as error the trial court's ruling and order admitting to probate Mabel French's 1951 holograph, Exhibit No. 1.

R.C.M. 1947, § 91-901, requires that "If any one appears to contest the will, *he must file written grounds of opposition* to the probate thereof * * *." Emphasis supplied.

Appellant's written grounds of opposition to the probate of the 1951 holograph, Exhibit No. 1, were: (1) that "it was *undated*"; (2) that writing on Exhibit No. 1 indicates that the deceased "did not consider it a valid will"; and (3) that "it does not meet the requirements of section 91-108, R.C.M. 1947, defining holographic wills."

As the concluding paragraph of her holograph, Mabel French

*wrote* a testimonium clause which ends with the numerals *"1951"* entirely written by the hand of the testatrix herself. Thereby she *dated* her holograph, Exhibit No. 1. A good coin minted by the United States of America, whether it be a silver dollar, a half dollar, a quarter of a dollar or a dime, or whether it be a nickel or a one cent piece bears no other or better or more complete *date* nor does a five or ten dollar bill or note.

The word *"undated"* used by the contestant in her written grounds of opposition is defined thus: "a. Not dated; not marked with a date", The New Century Dictionary, Vol. 3, p. 2088; "a. Having no date", Funk & Wagnalls New Standard Dictionary, Vol. 2, p. 2603; "1. Not dated, bearing no date; as an undated letter". Webster's New International Dictionary, 2d ed., Unabridged, Vol. III, p. 2764.

The 1951 holograph, Exhibit No. 1, is not an *"undated"* instrument. It is marked with the date *1951*. It was and is *dated*. The numerals, *"1951"*, *written* in the testimonium clause, evidences the fact that such instrument was written in the year 1951, at a time not more remote than January 1, 1951, and not later than midnight of December 31, 1951.

Mabel French left no other will or purported will bearing date of 1951, hence, no question is here presented as to which of two or more wills purporting to have been executed in 1951 is decedent's last will. There was and is no merit in appellant's objection and contention that decedent's 1951 holograph "was undated".

In the majority opinion in In re Irvine's Estate, 114 Mont. 577, 585, 586, 139 P.2d 489, 492, 147 A.L.R. 882, it is said:

"The legislature recognized that a holographic will may be most informal so long as the writing is all done by the hand of the testator alone, so long as he signs in some fashion, and so long as, in his own handwriting, he gives some *data,* figures or markings indicating the time when it was given or from which its operation is to be reckoned. The legislature expressly provided: 'It is subject to no other

form.' (Sec. 6981, Rev.Codes [1921, now R.C.M. 1947, § 91-108])

"To be valid, a holographic will need not be full and complete as to form, as to writing, as to signature, nor as to date. It is strictly up to the testator as to whether he shall use few or many words; as to whether he shall follow a legal form or disregard all forms and draft his will in his own language and fashion; as to whether he sign his name in full or by initials or by a nickname, and, finally, as to whether he shall write a full, complete and formal *datum* clause  *  *  *  or whether he shall be more brief and shorten his data or date to a simple memorandum which gives only the year and the month of execution.  *  *  *

"*  *  * In Webster v. Lowe, 1899, 107 Ky. 293, 53 S.W. 1030, 1031, the court admitted, as a holographic will, a writing which bore no date whatever, saying: 'To the validity of a will, the law does not require it should assume any particular form, or that any technically appropriate language should be used therein, if the intention of the maker is disclosed, and the destination of his property at his death is described.' * * *

"Clearly the validity of a holographic will is not dependent upon its formal character nor upon the fullness and completeness of its every detail. 'An absolute precision of execution is not expected in the case of an holographic will.' In re McMahon's Estate, 174 Cal. 423, 163 P. 669, 670, L.R.A.1917D, 778.  *  *  * 'Signature by an abbreviation, or by initials, or the word "Father" if intended as a signature, or "Mother," or by a nickname, is sufficient.' 1 Page on Wills. 3d Ed., § 389, p. 704. Holographic wills bearing the following signatures have been held to fully meet the statutory requirements, viz.: 'from a loving Mother' (In re Henderson's Estate, 196 Cal. 623, 238 P. 938); signed, 'your brother Ed' (Barnes v. Horne, Tex.Civ.App., 233 S.W.

859), and signed only with the initials 'E.M.P.' (Pilcher v. Pilcher, 117 Va. 356, 84 S.E. 667.) * * *

"The courts have likewise held that a wrong date or even an impossible date given in a holographic will does not invalidate it as where the year '1880' was used instead of '1890' (Barney v. Hayes, 11 Mont. 99, 27 P. 384; Id., 11 Mont. 571, 29 P. 282, 28 Am.St.Rep. 495); and the figures '1859' were used instead of '1889'. In re Fay's Estate, 145 Cal. 82, 78 P. 340, 104 Am.St.Rep. 17. In Doran v. Mullen, 78 Ill. 342, the appellate court sustained a will that bore date after the death of the testator, and in In re Wilkinson's Estate, 113 Cal.App. 645, 298 P. 1037, the will was held sufficient where the words, 'December Fourth, *nine* hundred and twenty eight' were used instead of 'December 4th, 1928,' being an error of an even 1,000 years. * * *

"This court in In re Noyes' Estate, supra, quoted as follows from In re Estate of Fay, 145 Cal. 82, 78 P. 340, 104 Am.St.Rep. 17: 'The date is not the material thing, although made necessary by the statute. It is a means of identification, and aids in determining the authenticity of the will; but the main and essential thing is that the will be wholly written and signed by the hand of the testator.' "

Volume 1, Page on Wills, Bowe-Parker Revision, § 1.3, at page 6 says, "a holographic will is one that is written wholly in the testator's handwriting and signed by him."

The Montana statute, defining a holographic will, makes no mention whatever of inserting or incorporating in such a will, either, the *day* of the month, or, the *month* of the year of its execution.

R.C.M. 1947, § 91-108, reads:

"91-108. (6981) *Definition of a holographic will.* A holographic will is one that is entirely written, dated, and signed by the hand of the testator himself. It is subject to no other form, and may be made in or out of this state, and need not be witnessed."

It stands undisputed that each and every word, figure, number, character, symbol, abbreviation, letter, period and comma in the entire 1951 holograph, Exhibit No. 1, was wholly written by the hand of Mabel French, herself, and by no other person.

The Legislature possesses the authority to require, by legislative enactment, that to be entitled to admission to probate, a holographic will, *must* specifically set forth the *month,* the *day,* the *hour* and the *minute* of the hour of its execution, but as yet, no Montana Legislature has ever exercised any such authority.

In the absence of such legislative enactment, the judges of the courts of this state most certainly are lacking in the authority and power to invade this field that is reserved for the Legislative Department alone and legislate any such specific omitted requirement, into a most general statute, section 91-108, supra, which at no time since its original enactment in 1877, has ever contained any such specification or requirement.

In fact, the Montana Legislature by its enactment of R.C.M. 1947, § 93-401-15, has prohibited the judges of this state, when construing or interpreting statutes, such as R.C.M. 1947, §§ 91-107 and 91-108, and instruments such as Exhibits Nos. 1 and 2 herein, from either *inserting* therein what has been *omitted,* or from *omitting* therefrom what has been *inserted* except in the rare instances such as are expressly provided for in such special statutes as R.C.M. 1947, §§ 91-117, 91-204 and 91-205.

The Legislature, by its enactment of R.C.M. 1947, § 93-401-15, has definitely declared that, ''In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, *not to insert what has been omitted, or to omit what has been inserted;* and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.'' Emphasis supplied.

R.C.M. 1947, § 12-202, provides: *''Codes, how construed.* The rule of the common law that statutes in derogation thereof are

to be strictly construed has no application to the codes or other statutes of the state of Montana. *The codes establish the law of this state* respecting the subjects to which they relate *and their provisions and all proceedings under them are to be liberally construed with a view to effect their objects and to promote justice."* Emphasis supplied.

R.C.M. 1947, § 91-210, reads:

"91-210. (7025) *Intestacy to be avoided.* Of two modes of interpreting a will, that is to be preferred which will prevent a total intestacy."

R.C.M. 1947, § 93-401-16, in part, reads: "In the construction of a statute the intention of the legislature, and in the construction of the instrument the intention of the parties, is to be pursued if possible."

"Interpretation must be reasonable." R.C.M. 1947, § 49-134. "An interpretation which gives effect is preferred to one which makes void." R.C.M. 1947, § 49-133. "The law respects form less than substance." R.C.M. 1947, § 49-120. "The law neither does nor requires idle acts." R.C.M. 1947, § 49-124. "The law disregards trifles." R.C.M. 1947, § 49-125.

In Savage v. Bowen, 103 Va. 540, 546, 49 S.E. 668; it is said:

"The purpose of the statutory requirements with respect to the execution of wills was to throw every safeguard deemed necessary around a testator while in the performance of this important act, and to prevent the probate of a fraudulent and supposititious will instead of the real one. * * * It is, however, quite as important that these statutory requirements should not be supplemented by the courts with others that might tend to increase the difficulty of the transaction to such an extent as to practically destroy the right of the uninformed layman to dispose of his property by will."

*Re-execution of Will.* In 1951 Mabel French by her own hand, on a single sheet of paper, wrote and signed her 1951 holograph, Exhibit No. 1, without the aid or assistance of either attorneys or attesting witness. The *words* that she wrote expressed her wishes and *will*. This is one *way* of disposing of all her property at death. It is a *way* that required neither the aid of attorneys nor witnesses. It involved no fees for attorneys nor scriveners. It is a *way* sanctioned by R.C.M. 1947, § 91-108.

"A will is not a sheet of paper, nor a number of sheets or pages; *it is the words written thereon.*" Emphasis supplied. In re Golden's Will, 165 Misc. 205, 300 N.Y.S. 737, 738. Also see In re Estate of Chase, 51 Cal.App.2d 353, 124 P.2d 895, 899.

"A will is defined to be 'the just sentence of our will touching what we would have done after our death.' " Payne v. Sale, 22 N.C. 455, 458. To like effect see Turner v. Scott, 51 Pa.St. 126, at page 132, and Barney v. Hayes, 11 Mont. 571, at pages 575, 576, 29 P. 282, 284, 28 Am.St.Rep. 495, 497.

In Killian v. Nappier, 244 Ala. 130, 12 So.2d 402, 403, 404, the Supreme Court of Alabama held that a written instrument duly executed and witnessed, stating "I will all of my property to my wife, and make her executrix of my will, without bond", was obviously a will.

"Of all written instruments, wills are the least formal. Anything written, in any form, goes for a will, if it reveals the intention of the maker to dispose of his property at death * * * the intention of the testator is the guiding principle." Adams v. Simpson, 358 Mo. 168, at page 176, 213 S.W.2d 908, at page 918.

In 1955, Mabel French executed, acknowledged and signed another document, Exhibit No. 2, in the presence of two attesting witnesses who subscribed their names to the document. Again the *words* that she there wrote expressed her wishes and *will*. This is another and different *way* of disposing of all her property at death. It is also a *way* that required no attorney and that involved no attorney's fees. However, it did require

the attendance and assistance of two attesting witnesses. This is a *way* sanctioned by R.C.M. 1947, § 91-107.

In each document, Exhibits Nos. 1 and 2, Mabel French employed the same dispositive testamentary *words* and left all her property to the same individual, Dr. Earl T. Gangner, whom she therein nominated and appointed to be the executor thereof and whose name appears twice in each document, and in each instance the testatrix inserted such name in longhand script, written wholly and entirely by her own hand.

In her writing of each document, Exhibits Nos. 1 and 2, the testatrix, Mabel French, consistently experienced the same spelling difficulties, writing the word devise with but one *"e"*, thus *"divise"*, and omitting the letter *"u"* from the word executor which she wrote *"exector"*.

The dispositive testamentary *words* were the same and the named devisee, legatee and executor was one and the same individual in both Exhibits Nos. 1 and 2, hence while written on two separate sheets of letter-size paper, there is, in truth and in fact, but one and the same will wherein the testatrix expresses the same desires, wishes and will touching that which she would have done with her property after her death. Barney v. Hayes, supra.

Clearly, under the plain mandate of the statute these two testamentary instruments, Exhibits Nos. 1 and 2, executed by the same testatrix, are required to be taken and construed together as one instrument. R.C.M. 1947, § 91-204. When this is done any claimed deficiency in the *dating* of the 1951 holograph, Exhibit No. 1, may be readily supplied by the 1955 witnessed will, Exhibit No. 2, which is twice *dated,* — first by the word and figures "July 18, 1955" appearing at the top of document and second, in the testimonium clause with which the writing ends reading, "In witness whereof I have herewith set my hand and seal this 18th day of July 1955," neither of which date is required by the provisions of R.C.M. 1947, § 91-107, governing the execution of witnessed wills.

*Simple Method of Changing Will.* After its execution in 1951, Mabel French was privileged to make any change she desired in her 1951 holograph Exhibit No. 1 for same could not be effective as a will until her death. Had she desired to change her holograph, which required no witness (§ 91-108, supra), into a witnessed will which requires two witnesses (§ 91-107, supra) it was not at all necessary that she rewrite her entire will to achieve this result.

Mabel French could have effected the desired change by simply exhibiting to her two attesting witnesses her already written 1951 holograph, Exhibit No. 1, — acknowledging to them that she had written and signed same as and for her last will and then, in the presence of the testatrix and at her request, having each witness sign her name at the end of the document opposite the word "Witnesses", which word the testatrix had written thereon more than three years before.

This done, the 1951 holograph, Exhibit No. 1, would have been changed into a duly attested will requiring no other or further writing thereon and to which section 91-107 alone would apply. This statute contains no requirement that such witnessed will give or show either the *place* where nor the *date* when it was made or executed. See R.C.M. 1947, § 91-107.

Instead of adopting the above simple method, Mabel French rewrote, re-executed, redeclared and republished the same *will* that she had theretofore written entirely in longhand script but with these two additions: (1) she *twice dated* her witnessed will giving the *day, month* and *year* of its execution, and (2) she acknowledged such witnessed will before two attesting witnesses each of whom signed her name at the end thereof. In the probate of this witnessed will, the provisions of sections 91-204, 91-205, and 91-125 apply, as no part of Exhibit No. 1 is in any wise or manner inconsistent or irrreconcilable or incompatible with any part of Exhibit No. 2. These two writings are to be taken and construed together as one instrument and they are to be admitted to probate as such. R.C.M. 1947, § 91-204.

Mabel French's two writings expressing her will do not stand alone — they stand *together*. She kept them *together* during her lifetime. They were found *together* in her strong box upon her death.

"An attempted holograph which is not entirely in the handwriting of testator may be republished by a codicil which is executed as an attested will." 2 Page on Wills, 3rd ed., § 552, pp. 25, 26, note 2.

In Johnson v. Johnson, Okl., 279 P.2d 928, 930, it is said: "By definition a codicil is a supplement to, an addition to or qualification of, an existing will, made by the testator to alter, enlarge, or restrict the provisions of the will, to explain *or republish it*, or to revoke it, and it must be testamentary in character. In re Whittier's Estate, 26 Wash.2d 833, 176 P.2d 281. A codicil need not be called a codicil. In re Carr's Estate, 93 Cal.App.2d 750, 209 P.2d 956; In re Atkinson's Estate, 110 Cal.App. 499, 294 P. 425." Emphasis supplied.

R.C.M. 1947, § 19-103, subd. 6, reads:

"6. The word 'will' includes codicils."

It would appear that the 1955 witnessed will, Exhibit No. 2, *republishes* the 1951 holograph, Exhibit No. 1, and that it is in effect but a codicil regardless of by what other name it may be called.

"*In case of holographic will* it has been held that it may be revived only by a duly attested will or by another holographic will * * * It has also been held, however, that whatever number of wills the deceased may have executed after the date of a holographic will, the keeping of it deposited among his valuable papers with the intent that it should operate as his will, amounts to a republication at his death in the absence of any other will, or in the event of the spoliation of a subsequent will." 95 C.J.S. Wills § 299, p. 89.

In the case of In re Eggleston's Estate, 129 Cal.App.2d 601, 277 P.2d 469, 471, two instruments were admitted to probate as a single holographic will. There the court said:

"In the interpretation of a will, ascertainment of the intention of the testator is the cardinal rule of construction, to which all other rules must yield. Prob.Code. § 101; In re Estate of Salmonski, 38 Cal.2d 199, 209, 238 P.2d 966; In re Estate of Lawrence, 17 Cal.2d 1, 6, 108 P.2d 893. In re Estate of Foley, 126 Cal.App.2d 810, 273 P.2d 26. * * * The instrument is to be examined with a view of discovering the decedent's testamentary scheme or general intention; and the meaning of particular words, phrases, and provisions shall be subordinated to such scheme, plan, or dominant purpose. In re Estate of Raymond, 96 Cal.App. 2d 808, 814, 216 P.2d 515. * * * And since the will was drawn by the testator, obviously without legal aid. 'he may not be supposed to have used the same niceties of descriptive language as would be employed by an expert draftsman.' In re Estate of Soulie, 72 Cal.App.2d 332, 334, 164 P. 2d 565, 567.''

In Sloan v. Beatty, 1 Ill.2d 581, 589, 590, 116 N.E.2d 375, 380, a holographic will dated in February 1903 and a holographic codicil thereto, dated in June 1910, more than seven years later, were admitted to probate as testator's last will. There the appellate court said:

"The paramount rule of testamentary construction is that the intention of the testator as expressed in his will governs the distribution of his estate, and the intention of the testator, once it has been ascertained, will be given effect unless to do so would violate some settled rule of law or would be contrary to public policy. Barnhart v. Barnhart, 415 Ill. 303, 114 N.E.2d 378. All rules of construction yield to the intention of the testator as expressed in the will and no rule of construction will be applied to defeat that intention. Harris Trust & Savings Bank v. Jackson, 412 Ill. 261, 106 N.E.2d 188. Effect must be given to the whole will and the testator's intention cannot be determined from the language of any particular clause, phrase or sentence. Mo-

narski v. Greb, 407 Ill. 281, 95 N.E. 2d 433; Lydick v. Tate, 380 Ill. 616, 44 N.E.2d 583, 145 A.L.R. 1216. There is always also the word of caution that since no two wills are ever exactly alike, the precedents in other will cases are never of controlling importance in determining the intention of the testator as expressed in the particular will under consideration. Barnhart v. Barnhart, 415 Ill. 303, 114 N.E.2d 378."

In Kramer v. Crout, Tex.Civ.App.1955, 279 S.W.2d 932, 934, the appellate court affirmed an order of the trial court admitting to probate a holographic will of the testatrix and receiving in evidence a number of specimens of handwriting of testatrix, including a lengthy letter of instructions to one Elizabeth Crout of similar purport as Exhibit No. 3 herein, which letter, the appellate court said, "indeed might well have been probated as the will of testatrix itself." In part, the letter reads:

"My Dearest Elizabeth:

"I am requesting you to Carry out these few requests. * * * First—be shure to meet.—the State & County Tax's on this Doyle Ranch — especially — the Tax's in Hamilton County.—Keep—the Federal loan—on the Isaac Adams Survey—in Hamilton Co promptly paid—Always— meet the interest promptly—And. you'll soon have it paid: —Should you find it—'too hard' to meet this interest— 'Then you can sell off the Cattle to pay same: Carry. On—Everything—just as I did:

*  *  *  *  *  *  *  *

"When—I pass—Out. see that. I. Am buried—Either next to Tony—on that side—Or—put me Over on the Other side—Give me plenty of room: * * * be shure —that 'I get plenty of room When—I am buried—dont Crowd me—in a 'Small space—please—I likewise * * * ask you—to use special Care In selecting A Lawyer— to attend to This Will—'Dont get some *Grafter* (as most

of them are: Who will rob you Out of your Eye—teeth— 'And then pretend 'they are your *Friend'* A Lawyer—Is more deadlier than a Rattlesnake—So—look—Out.

\*   \* .   \*   \*   \*   \*   \*   \*

"Don't give 1 cent to Kin-folks—Priest's—nor Preacher's—nor—any Churche's   \*   \*   \*   Reach out to.—the Suffering—helpless—& sick people And let. this. property —I leave you Do some good: So I recommend Charity— Not. Kin-Folks—   \*   \*   \*''

The date on the above letter in the Kramer case, supra, is the same as the date on the will and in the instant French case the date on the letter of instructions to Dr. Gangner, Exhibit No. 3, herein is of the same date as the witnessed will, Exhibit No. 2, herein.

In Watts v. Choàte, 117 Mont. 505, at pages 523-527, 160 P.2d 492, at pages 500, 501. Mr. Justice Angstman, dissenting wrote:

"I think a holographic will may, by reference, incorporate another instrument which is not entirely in the handwriting of the testator. This court, in line with the overwhelming weight of authority elsewhere, has held that a holographic will may by appropriate reference incorporate a paper not of a testamentary character and not wholly in the handwriting of testator so as to make it a part of the holographic will. This was so held in In re Noyes' Estate, 40 Mont. 231, 106 P. 355, 357, where this question was under consideration regarding an instrument not in the handwriting of the testator and the court said: 'So, also, a paper not of a testamentary character is to be construed with one having that character, whenever the latter has, by appropriate reference to the former, incorporated it within itself, thus giving it also a testamentary character. Barney v. Hayes, 11 Mont. 99, 27 P. 384; Id., 11 Mont. 571, 29 P. 282, 28 Am.St.Rep. 495; Estate of Skerrett,

67 Cal. 585, 8 P. 881; In re Estate of Plummel, 151 Cal. 77, 90 P. 192, 121 Am.St.Rep. 100.' * * *

"The court in the Noyes' case (Mr. Justice Holloway dissenting) held that the letter in question did not properly refer to any paper and hence no document was to be considered as incorporated in and made a part of the letter. But the case holds squarely that a document properly referred to may be considered as part of the holographic will.

"Cases from other jurisdictions holding that existing documents not entirely written, dated and signed by the testator may be considered as a part of the holographic will when properly referred to, and that parol evidence may be resorted to to identify the instrument, are the following: In re Miller's Estate, 128 Cal.App. 176, 17 P.2d 181; Simon v. Grayson, 15 Cal.2d 531, 102 P.2d 1081; In re Estate of Dimmitt, 141 Neb. 413, 3 N.W.2d 752, 144 A.L.R. 704; In re Anthony's Estate, 21 Cal. App. 157, 131 P. 96. * * *

"As was said by the court in Heaston v. Kreig, 167 Ind. 101, 112, 77 N.E. 805, 809, 119 Am.St.Rep. 475: 'The doctrine is, that when a man has expressed clearly his intention to dispose of his estate, and has taken an ineffectual mode of doing it, yet if the instruments can be construed in another manner, so as to effectuate his purpose, the ceremony is a matter of form, and the substance shall be carried into execution, if it may be law.' And the court in that case, quoting from Lord Hale, said: 'That the judges ought to be curious and subtle to invent reasons and means to make acts effectual, according to the just intent of the parties * * * The judges in these later times (and I think very rightly) have gone further than formerly, and have had more consideration for the substance, to-wit, the passing of the estate, according to the intent of the parties, than with the shadow to-wit,

the manner of passing it.' And see In re Hengy's Estate, 53 Idaho 515, 26 P.2d 178.

\* \* \* \* \* \* \* \*

"\* \* \* *No one but the testator has any right to say how his property shall be disposed of after his death, if he has exercised the right to speak on the subject. I think it is proper for a testator to adopt by reference in a will any documents he sees fit and if he is so disposed he may later destroy one or more of them and that would be nobody's business but his own.* \* \* \*

"Holographic wills need not be in any particular form. It is enough that the intention is made plain. Barney v. Hayes, supra; Dahmer v. Wensler, 350 Ill. 23, 182 N.E. 799, 144 A.L.R. 709. \* \* \* The letter was wholly written, dated and signed by John Watts and the jury so found. Plainly he wanted his sister Ida Choate to have all of his property. *Just why should Mrs. Choate be penalized for the mistake of Mr. Watts in not hiring a lawyer to express his intention with more elegant phrases and in better grammatical style?*" Emphasis supplied.

*Attestation Clause.* As heretofore shown the statute requires that any person who appears to contest a will "must file *written grounds* of opposition to the probate thereof." R.C.M. 1947, § 91-901. Emphasis supplied.

The one and only *written ground* of opposition to the probate of the 1955 witnessed will, Exhibit No. 2, asserted by the contesting appellant, Edyth M. Brown, was "that said document does not meet the statutory requirement for a written will in that it is completely devoid of an *attestation clause.*"

The statute neither requires nor does it even mention an attestation clause. See R.C.M.1947, § 91-107.

"A will is perfectly valid though there is no attestation clause." Atkinson on Wills, p. 297.

"The attestation clause is deemed a formal, nonmaterial and nondispositive provision which, although forming part of the

will, is not necessary to the validity thereof." In re Mackris' Estate, Sur.1953, 124 N.Y.S.2d 891, at page 894.

"Neither a formal attestation clause nor even words in addition to the signatures of the witnesses are prerequisites to a valid execution of a will." Barber v. Barber, 368 Ill. 215, 220, 13 N.E.2d 257, at pages 260, 261. To same effect see Spangler v. Bell, 390 Ill. 152, 60 N.E.2d 864.

"An attestation clause has weight in showing the proper execution of a will, but it is not an essential part thereof." In re Frechette's Will, Sur.1954, 133 N.Y.S.2d 80, at page 81.

In the case of In re Bragg's Estate, 106 Mont. 132, at page 142, 76 P.2d 57, at page 62, this court said that in this state, "no particular attestation clause is prescribed by statute".

Since the statute, § 91-107, supra, does not require any attestation clause neither the trial judge nor the justices of this court may lawfully read into nor insert in the provisions of § 91-107, any such requirement. See R.C.M. 1947, § 93-401-15.

In Thompson on Wills, 3d ed., 209, § 132, it is said:

"The law does not require a formal attestation clause. Hence the validity of the execution of a will depends not on the attestation clause, but on the conformity of such execution to the requirements of the statute and the testimony of the subscribing witnesses. It has weight in showing the proper execution of the will, but it is not an essential part thereof."

In 1 Page on Wills (3d ed.), § 373, p. 677, it is said: "Under a statute which provides that the witnesses must sign the will, but which makes no provision for their signing a certificate in any specified form, a formal attestation clause is not necessary. Any form of signing which shows it is done with the intention of acting as a witness is sufficient. * * * The signatures of the witnesses, without any additional word explanatory of their purpose in signing is held sufficient."

In Alexander's Commentaries on the Law of Wills, Vol. 1, § 506, p. 688, it is said: "An attestation clause appended to

a will is useful as proof * * * but it is no part of the execution of a will and is not essential to its validity. The attestation clause may consist of the single word 'witness', or 'attest', or the witnesses may simply sign their names without any additional writing." See Osborn v. Cook, 11 Cush., Mass., 532, 59 Am.Dec. 155.

In the case of In re Fowle's Estate, 292 Mich. 500, 290 N.W. 883, 886, the court said:

" 'Attestation is the act of witnessing an instrument in writing at the request of the party making the same and subscribing to it as a witness.' Bouvier's Law Dictionary, Rawle's Third Revision, page 280.

"The law does not require a formal attestation clause. [Citing case.] There is no question but that testatrix signed the instrument, requested the witnesses to sign as witnesses, and they did so. The will was properly executed and the circuit court was right in upholding it."

In Burkland v. Starry, 361 Mo. 348, 234 S.W.2d 608, 611, 40 A.L.R.2d 1217, the court said, concerning a contested will that had no attestation clause: "Such clause is not required. 'Attestation' by 'subscription' is sufficient."

In Cunningham v. Hallyburton, 342 Ill. 442, 445, 174 N.E. 550, 551, the court held that in the execution of a will, "Neither a formal attestation clause nor even words in addition to the signatures of the witnesses are necessary."

In re Pitcairn's Estate, 6 Cal.2d 730, 59 P.2d 90, at page 92, it is said: "There is no need of an 'attestation clause'; it is sufficient that a will be witnessed or attested, and the recital of the steps in execution is not required. 68 C.J. 711, § 392. It does not seem reasonable, therefore, to have the important presumption of due execution turn upon the presence or absence of this unnecessary provision. The foundation of the presumption is the proof of genuineness of the signatures, for the instrument is then on its face a valid will."

In re Chambers' Estate, 187 Wash. 417, 60 P.2d 41, at page

43, it is said: "The document now before us contains no attestation clause whatsoever, but, if competent witnesses present before the court testify that they subscribed their names to a document in the presence of the testator, and to facts which amount in law to an attestation, under the law of this jurisdiction it is not essential that formal words of attestation be attached to the will."

In re Akin's Esate, 41 N.M. 566, 72 P.2d 21, an action to contest a will, holds that in the absence of an attestation clause, where the will is subscribed by the genuine signature of the testator with the genuine signatures of two persons under the word "witnesses" below the signature of the testator, that such showing raises a presumption of the due execution of the will in compliance with the requirements of the statutes of that state.

In Wehrkamp v. Burnett, 82 Colo. 5, 256 P. 630, it is said: "It is objected that there is not the usual statement of attestation by the witnesses, but such statement is merely a memorandum of facts which if they exist without it, are sufficient, and is perhaps prima facie evidence, but no more."

In Berberet v. Berberet, 131 Mo. 399, 408, 33 S.W. 61, 63, the court held that under a statute providing that every will shall be attested by two or more witnesses, subscribing their names to the will in the presence of the testator, the signatures of the witnesses, without the attestation clause is sufficient. Therein the court said:

"The statute says the will shall be 'attested by two or more competent witnesses *subscribing* their names thereto.' It does not say that the word 'Attest' shall be written on, or at the conclusion of, the will, or that there shall be written thereon anything whatever other than the names of the attesting witnesses."

Appellant's written objection, that the 1955 witnessed will fails to meet the statutory requirements because it has no for-

mal attestation clause, is wholly lacking in merit and such objection should be denied.

*Filling In Blanks.* Mr. Justice Castles' opinion herein, in considering the 1955 witnessed will, Exhibit No. 2, states that "the name of the sole beneficiary and executor was filled in by pen in the handwriting of the testatrix rather than being typewritten," and then states that, "The district court, in admitting the holographic will to probate, sustained the heir's objections to the typewritten will but gave no reasons for this ruling."

As before stated the statute, section 91-901, supra, requires that the contestant, Edyth M. Brown, "must file written grounds of opposition to the probate * * * and serve a copy on the petitioner and other residents of the county interested in the estate". Since the contesting appellant's only written ground of objection to the 1955 witnessed will, Exhibit No. 2, was "that it is completely devoid of an attestation clause", appellant is precluded from urging, either before the trial court or in the supreme court, that the validity of such will is affected by the writing in by the hand and pen of the testatrix of the name of the sole beneficiary and executor.

The testatrix had the right to write part of the will with a typewriter and to write part of it with pen and in longhand script if she chose. She likewise had the right, at any time during the remainder of her life, either before or after acknowledging the instrument to fill in any blank space left for the name of her devisee and legatee or for the name of her executor, by writing such name therein in her own handwriting regardless of whether the will was on a partly printed form or on a partly typewritten form.

"Interlineations in a will which show upon their face that they are but the filling of blanks or completion of the sense of the instrument need not be proved to have been made before

the will was executed." 57 Am.Jur. Wills, § 511, p. 355, note 12.

"The filling of blanks left in the form or draft of a will to allow the names of legatees or the amounts of legacies to be inserted is an act presumptively done prior to the execution. In fact, the mere filling of blanks of that character is probably not to be regarded as an alteration, and a similar view is taken of words added to complete the sense, seemingly on the theory that it is fair to presume in the first instance that the omission of the needed words when the instrument was first prepared was discovered in due time." 34 A.L.R.2d at pages 627, 628, 629.

In Martin v. Martin, 334 Ill. 115, 165 N.E. 644, 648, 67 A.L.R. 1127, at pages 1134, 1136, 1137, it is said:

"The first question presented for consideration is whether the filling of blanks may be considered alterations. That question has never been directly passed on by this court. Page on Wills, § 787, divides interlineations into two classes, one of which arises where the inserted words are necessary to the sense of the will or are inserted in blanks left for that purpose. He states that it will be presumed that such words were inserted before execution. Strictly speaking, however, the insertion of such words as are necessary to fill blanks or to express the sense of the will is not an alteration. If it be held to be such, then it might become necessary in all cases where a printed form of will is used and the blanks filled in, to explain the filling of the blanks. Such a rule would find no basis either in law or reason. As has been said by this court in the cases herein cited, the instrument itself may show that there is no necessity for explanation of insertions or interlineations. The filling of blanks or the writing in of words necessary to the sense of the will seems clearly to come within the scope of such language as would show on the face of the will satisfactory evidence that they were in-

serted before the will was executed. Jarman on Wills, vol. 1, *144, is of the view that, where a will has been drawn with blanks left for names of legatees or amounts of legacies, which blanks are filled, but there is no evidence to show when, the presumption is that the blanks were filled before the execution of the will; and that this is true with such interlineations as supply the sense of the instrument when the last-named interlineations appear to have been written with the same ink and at the same time as the rest of the will. * * * In this case it seems clear that all interlineations which show that they are but the filling of blanks or completion of the sense of the instrument are not alterations, and therefore do not come under the rule of law requiring explanation. * * *

"The interlineations in this will, with the exception of those showing changes in the meaning expressed in the typed will, amount to but the filling of blanks, or such as are necessary to the sense of the will, or are such as in no wise change the sense of the will, and such interlineations should be held to have been written in before the will was executed. * * * *The probate of wills does not depend upon the recollection, or even the veracity, of subscribing witnesses, and where, as here, the witnesses have testified, as required by statute, to the execution of the will, if, forgetfulness or falsehood of a witness concerning interlineations can invalidate a will, it would become easy in many cases to use such artifices or corrupt practices as would render the best will nugatory.* Hutchison v. Kelly, supra [276 Ill. 438, 114 N.E. 1012]; Schofield v. Thomas, 236 Ill. 417, 86 N.E. 122; Gould v. Chicago Theological Seminary, 189 Ill 282, 59 N.E. 536. If Holland had written the whole will at the time it was executed, or had used a printed form, filling blanks and making changes thereon, suspicion would not necessarily arise that any of such changes were made after the will was executed. We are

of the opinion that the present condition of the will is satisfactorily explained by the evidence. The fact that alterations of a form of will have been made does not of itself require explanation.'' Emphasis supplied.

In Williams v. Swords, 129 Mont. 165, 284 P.2d 674, 677, the district court sitting without a jury found against the contestant opposing the probate of the witnessed will of Violet Williams Swords. The subscribing witnesses were husband and wife, who for many years prior to signing their names as witnesses to the will, were close and intimate friends of the testatrix and specially selected by her to act as such witnesses, as testatrix placed special trust in them for such purpose. At the trial, both subscribing witnesses testified: That the testatrix did not sign the will in their presence; that she did not acknowledge that the document was her will; that when they signed the paper it was folded so that all they could see was the line whereon they signed as witnesses; that they did not sign in the presence of each other; that they went to the home of the testatrix at her request to witness the paper; that the husband signed first and then handed the pen to his wife and left the room as the wife signed and that they did not learn the document was a will until after the testatrix had died and after the will was publicly read.

In affirming the order and decree of the district court dismissing the contest and admitting the will to probate, Mr. Justice Angstman, speaking for this court, in part, said:

''Here unmistakably the will before us was the will of Violet Swords and no one else. The record shows that she prepared the will after procuring a copy of another will to be used as a form. She requested the witnesses to sign and witness the instrument. They did sign it in the presence of Violet Swords, and to all intents and purposes signed it in the presence of each other. * * *

''There is in this case no question about the genuine-

ness of the instrument which the court admitted to probate as the will of Violet Swords.

"* * * in the Massey case, supra [213 Ala. 178, 104 So. 498], * * * it is said: 'When a person writes his name as a witness to a will at the request of the testator and in his presence, under the word "witness" or other equivalent phrase, as here shown, he impliedly certifies thereby that he saw the testator sign his name to the instrument, or that he saw the name of the testator on it and the testator acknowledged that it was his signature. It will be competent for him to testify to the contrary because the court and jury desire the truth, but the jury or court, sitting as a court and a jury, should consider his contradictory oral evidence with great caution and scan it with grave suspicion; on account of it contradicting his written testimony, it reflects on his (witness') credibility, and it is contrary to the confidence placed in him by the testator.'

"We agree with the trial court's conclusion which he stated in his memorandum accompanying his decision that 'the court may hear and determine the value of the testimony and weigh the presumptions of regularity against the oral statements of the witnesses on the stand, and make its decision. * * * The Court takes the view that under the presumptions and the evidence and all the circumstances disclosed at the trial, that the preponderance of the evidence lies with the proponent, and that the will should be admitted to probate. One cannot review the evidence in this case without coming to the definite conclusion that Mrs. Swords died with the belief that she had disposed of her property according to her wishes by a valid will. The right to dispose of one's property by will should not be denied if it is possible to uphold the validity of the will.'

"* * * But says appellant the presumption of the due execution of the will does not arise in this case because

the subscribing witnesses did not know that they were signing an attestation clause of a will. He argues that the declaration in the attestation clause was not the declaration of the subscribing witnesses since they testified that they knew not what they were signing. *To sustain this contention would leave a will at the mercy of the subscribing witnesses which,* as stated in the Reith case, supra [German Evangelical Bethel Church v. Reith, 327 Mo. 1098, 39 S.W.2d 1057, 76 A.L.R. 604], *the law will not do.*" Emphasis supplied.

*Executor's Competency.* R.C.M.1947, § 91-1302, so far as pertinent here, provides:

"No person is competent to serve as executor who, at the time the will is admitted to probate, is:

"1. Under the age of majority;

"2. Convicted of an infamous crime;

"3. *Adjudged* by the court or judge incompetent to execute the duties of the trust by reason of drunkenness, improvidence, or want of understanding or integrity." Emphasis supplied.

(1) There was no contention here that the proponent Dr. Gangner is under the age of majority.

(2) There was an evasive and abortive attempt by counsel for the appellant, Edyth M. Brown, to plead and allege in appellant's *prayer* to her "Opposition" to the admission to probate of Exhibits Nos. 1 and 2, that the proponent "is not eligible to receive letters testamentary upon the ground" that he "has been convicted of an infamous crime and is disqualified under the provisions of section 91-1302(2), R.C.M.1947", but there was and is no evidence in the record before us to support any such charge even though it had been properly pleaded, which is not the situation here. The records of this court, as well as those of two district courts of different jurisdictions in this state, bear witness to the fact that in these proceedings

the proponent was falsely accused of having been convicted of an infamous crime.

(3) Notwithstanding, the mandate of the statute that anyone who appears to contest a will "must file written grounds of opposition to the probate thereof" (§ 91-901, supra), no party to these proceedings has at anytime filed any writing herein charging that the proponent has ever been *adjudged* incompetent to execute the duties of his trust as executor by reason of either drunkenness, or improvidence, or want of understanding or want of integrity and, had any such charge been made, there was and is no evidence or proof of any sort or character in this entire record that would prove or establish such a charge.

The word *"adjudge"* is defined as follows: "To decide, settle, or decree judicially; to sentence or condemn." 1 Rapalje and Lawrences Law Dictionary, p. 27; "To determine, in the exercise of judicial power. Adjudged: decided judicially." 1 Abbott's Law Dictionary, p. 31; "To pass a sentence; to decree; to decide judicially." Law Dictionary by Arthur English, p. 22.

The transcript on appeal filed in this court contains a bill of exceptions to which is attached the certificate of the trial judge bearing date of March 26, 1958, wherein that judge certified that such bill "is full, true and correct and contains all of the evidence and testimony introduced upon said trial, together with all matters and proceedings had at the trial, and the orders of the Court then and thereafter made, and the same is by me signed, settled and allowed."

*Denial of Due Process—Drunkenness.* In the second paragraph of the mutiple minute entry ruling and order made and entered on January 10, 1958, in the trial court's Journal BF, page 594, the trial judge denied the petition of the proponent for the issuance to him of letters testamentary upon the ground that at the hearing of this cause and elsewhere

the proponent has demonstrated himself incompetent to execute the duties of the trust by reason of drunkenness.

The seventh paragraph of the trial court's multiple formal order of January 13, 1958, reads:

"It is ordered that the petition of E. T. Gangner, M.D., named in said holographic will as executor is denied letters testamentary upon the ground that the said E. T. Gangner at the hearing of this cause and elsewhere appeared before the Court and its presiding judge in a condition of such intoxication as to demonstrate himself incompetent to execute the duties of this trust by reason of drunkenness (R.C.M.1947, Section 91-1302).''

There is no evidence in the entire record before this court that in any wise or manner sustains, supports or warrants the making of either of the above rulings and orders.

There are no written objections filed herein by any party to these proceedings that accuse the proponent, Dr. Gangner, with being incompetent by reason of drunkenness, nor is there any evidence that he was at any time either charged, cited, heard or tried for being incompetent by reason of drunkenness.

Both the Constitution of the United States and the Constitution of the State of Montana require that the proponent Gangner be given and accorded due process of law, which includes an adequate accusation, complaint or charge in writing and that he shall be given due notice and an opportunity to be represented by counsel and a proper hearing before he shall be condemned. The record fails to show that Dr. Gangner has been accorded any of such rights.

In Root v. Davis, 10 Mont. 228, 244, 245, 25 P. 105, the facts were:

On March 10, 1890, Andrew J. Davis, a resident of Butte. died leaving an estate of the estimated value of four and one half or five million dollars. John A. Davis, a brother of the deceased, petitioned for letters of administration as did Henry

A. Root, a nephew of the deceased. Each petitioner filed written contest and objections to the appointment of the other. The district court of Silver Bow County overruled all objections to the appointment of John A. Davis and granted his petition for letters, whereupon Henry A. Root, the unsuccessful applicant for letters, appealed to this court.

Among his written grounds of objection filed in the district court, decedent's nephew, Henry A. Root, charged that decedent's brother, John A. Davis, was incompetent to execute the duties of the trust by reason of drunkenness. After a trial on the issues presented by Root's written objections and hearing the testimony of numerous witnesses, the district court found that the respondent, John A. Davis, was not disqualified and that he should not be adjudged incompetent by reason of drunkenness.

Relative to the trial court's finding on such issue of alleged drunkenness, this court, in determining the appeal, said:

"Upon a careful review of all the evidence introduced, we find no error in the conclusion reached by the court below upon this question. This question does not turn upon the fact that the applicant is shown to be in the habit of using intoxicating liquor to some extent. However reprehensible that habit may be as regarded from a moral point of view, *it is not within the province of the court to deny letters of administration to an applicant on the ground of mere use of intoxicants*. The drunkenness contemplated by this statute undoubtedly is that excessive, inveterate, and continued use of intoxicants to such an extent as to render the subject of the habit an unsafe agent to intrust with the care of property or the transaction of business. * * * *The vital question* in the investigation of this objection *is whether or not the applicant for letters is incompetent by reason of the inveterate use of intoxicants, and not whether he may or may not have used the same to some extent*.

"In the case at bar it is admitted by appellant's counsel

that the evidence introduced to establish the incapacity of John A. Davis by reason of drunkenness is meager. Witnesses introduced in support of that charge testified that he drank intoxicating liquor, and some testified that he used the same to considerable extent at times, yet none of these witnesses would undertake to say that he was incompetent to transact important business; nor did they testify to other facts from which the court could reasonably draw that conclusion.'' Emphasis supplied.

In 2 Bancroft's Probate Practice (2d ed.), § 231, p. 10, it is said: ''Where drunkenness is a disqualification, it is only such excessive, inveterate, and continuous use of intoxicants as renders one an unsafe agent to entrust with property or business that is contemplated.''

In 20 Cal.Jur.2d, Executors and Administrators, § 104, p. 151, it is said: ''The drunkenness contemplated by the statutes as a basis for an adjudication of incompetency to execute the duties of an administrator or executor is such an excessive, inveterate, and continuous use of intoxicants as to render the person an unsafe agent to be entrusted with the care of property or the transaction of business. However, the question is not merely the extent of the use of intoxicants by such person. He may be in the habit of imbibing intoxicants, even to a considerable extent, without being incompetent. The vital question is whether the use of the intoxicants is so habitual and inveterate as to incapacitate him for a great portion of the time from properly attending to business.''

*Appointment of Executor.* In re Minder's Estate, 128 Mont. 1, at pages 4, 5, 6, 28, 29, 270 P.2d 404, at page 406, 45 A.L.R. 2d 898, at pages 901, 902, 914, 915, this court said:

''It was the testator, and not his widow, who had the absolute right to name the person who should take charge of, manage and administer his estate.

''The appointment of an executor is left solely to the testator, unless he delegates this right. [Citing authorities.]

"The testator having exercised his right to choose his executor, the latter derives his authority from the will and his power to act from his qualifications in compliance with the law and not from the wishes of testator's widow. [Citing authority.]

\* \* \* \* \* \* \* \*

"Whom the testator will trust so will the law.

\* \* \* \* \* \* \* \*

"The testator's intent as to the person who shall be granted letters testamentary as such intent is disclosed by his will is controlling unless violative of law. [Citing statutes and cases.]

"Alfred Minder's will is valid. It must be given effect. \* \* '\* 'So far as possible, the courts carry out the intention of the testator by seeing that the trust is committed to the one designated by the testator.' 21 Am.Jur., Executors and Administrators, § 54, p. 404; In re Effertz' Estate, supra, [123 Mont. 45]

"The fact that an executor derives his authority primarily from the will serves to distinguish him from an administrator who is appointed by a court of probate from a person or class designated by statute and who derives his source of power solely by his appointment by the court. [Citing authorities.]

" 'The statutory right to administer an estate is a valuable right and one that may be enforced.' In re Wilcox' Estate, 122 Mont. 290, 201 P.2d 989, 990." Emphasis supplied.

In re Estate of Buckman, 123 Cal. App. 2d 546, 554, 267 P.2d 73, 80, 47 A.L.R.2d 291, it is said:

"It is the universal rule that a testator may name the person who shall be the executor of his will, and such person has a right to act in the absence of a specific statutory disqualification. Estate of Wellings, 192 Cal. 506, 510, 221 P. 628; Annotations, 95 A.L.R. 828; 54 Am.Dec. 518. It has

been held that, in the absence of some statute, the power to name an executor to administer an estate is coextensive with the power to bequeath or devise the estate itself. In re Guye's Estate, 54 Wash. 264, 103 P. 25, 26, 132 Am. St.Rep. 1111.

"The same considerations apply to the removal of an executor. A testator's selection of an executor should not be annulled except on a clear showing that the best interests of the estate require it. Estate of Sherman, 5 Cal. 2d 730, 744, 56 P.2d 230. * * *

" ' [I]t should be and is the policy of the law to give effect, as far as it can be legally done, to the expressed will of the deceased. The nomination of the executor is evidence of the confidence reposed in him by the testator, and the deliberate purpose and desire thus solemnly expressed as to the administration should not be thwarted unless the plain provisions of the law or the interests of justice demand it. * * * It has been declared that "the principle governing the disposition of applications such as this is expressed in the phrase '*whom the testator will trust so will the law.*' * * * The reason for taking away the authority of a person so chosen should be well-grounded upon undoubted proof of his utter improvidence and unfitness for the duties of his trust." ' * * *

" * * * Upon obtaining the information specified in section 521, it is the duty of the judge to cite the executor to appear and show cause why his letters should not be revoked. *He may not remove an executor on any of the grounds specified in section 521 without citing him to appear and giving him a fair hearing and an order predicated on evidence.* See Schroeder v. Superior Court, 70 Cal. 343, 11 P. 651.

" * * * *Before an executor is removed he must be accorded a hearing* and the court must have some fact legally before it in order to justify removal. *The facts relied on*

*for removal must be established by evidence,* and any proper evidence which tends to establish or refute the charges relied on is admissible. Hanifan v. Needles. 108 Ill. 403, 409-412; In re Paull's Estate, 90 Ohio App. 403, 101 N.E.2d 209; In re Glessner's Estate, 343 Pa. 370, 22 A.2d 701; In re Burr, 118 App. Div. 482, 104 N.Y.S. 29; 33 C.J.S. Executors and Administrators, § 91f & g, page 1042. * * *

*"The fundamental conception of a court of justice is condemnation only after notice and hearing. No one may be deprived of anything which is his to enjoy until he shall have been divested thereof by and according to law.* Under the constitutional guaranties *no right of an individual, valuable to him pecuniarily or otherwise, can be justly taken away without its being done conformably to the principles of justice which afford due process of law,* unless the law constitutionally otherwise provides. *Due process of law does not mean according to the whim, caprice, or will of a judge,* Matter of Lambert, 134 Cal. 626, 632-633, 66 P. 851, 55 L.R.A. 856 [86 Am.St.Rep. 296,] ; *it means according to law. It excludes all arbitrary dealings with persons or property.* It shuts out all interference not according to established principles of justice, one of them being the right and opportunity for a hearing : to cross-examine, to meet opposing evidence, and to oppose with evidence. Massachusetts etc. Ins. Co. v. Industrial Acc. Com., 74 Cal.App.2d 911, 170 P.2d 36.

*"Judicial absolutism is not a part of the American way of life. The odious doctrine that the end justifies the means does not prevail in our system for the administration of justice. The power vested in a judge is to hear and determine not to determine without hearing.* When the Constitution requires a hearing, it requires a fair one, one before a tribunal which meets established standards of procedure. It is not for nothing that most of the provisions of the

Bill of Rights have to do with matters of procedure. Procedure is the fair, orderly, and deliberate method by which matters are litigated. To judge in a contested proceeding implies the hearing of evidence from both sides in open court, a comparison of the merits of the evidence of each side, a conclusion from the evidence of where the truth lies, application of the appropriate law as to the facts found, and the rendition of a judgment accordingly.

"The constitutional right to notice and hearing cannot be taken away in the fashion that was attempted in the present case. *The judge's conception of his duty was entirely erroneous. The plainest principles of justice required that appellant be given notice of the specific charges against him.* No notice was given him that he was to be removed on the ground that he was so mentally deranged as to be incompetent to act as executor. If the judge had reason to believe from what was told him in chambers, or from appellant's conduct, or from both, that he was incompetent to act, he had the authority to suspend his powers. He had no authority or power, without notice or hearing, to remove him. Appellant was not only not accorded a just, fair, and impartial hearing; he was not accorded the right or opportunity of any hearing, either on the charge that the inventory was not filed in time or on the ground, not charged, that he was so mentally deranged as to be incompetent to act as executor. No legal evidence was produced that he was incompetent to act. He was denied the opportunity of presenting any evidence. His offer of proof was erroneously rejected. *In short, he was denied due process of law.*

"Reversed." Emphasis supplied.

The above-quoted seventh paragraph of the district court's multiple order of January 13, 1958, and the second paragraph of its minute entry ruling and order of January 10, 1958, entered in its Journal BF, page 584, wherein the trial court

denied the petition of E. T. Gangner, M.D., for the issuance to him of letters testamentary should be reversed, annulled, set aside and ordered stricken forthwith, as being erroneous, arbitrary and wholly unsupported by any evidence in the record before this court on this appeal.

*Spoliation of Estate — Void Orders.* The concluding paragraph of the trial court's order of August 9, 1957, reads:

"It is ordered, That letters of Special Administration of the Estate of the said Mabel French, Deceased, issue to the said petitioner Emmett Kelly upon his official bond."

The concluding paragraph of the trial court's multiple order of January 13, 1958, reads:

"It is ordered that the petition of Emmett Kelly, public administrator, for letters of administration with the will annexed is granted and said Emmett Kelly, public administrator is appointed administrator with the will annexed and that letters of administration with the will annexed issue to Emmett Kelly, public administrator, upon his taking the oath and upon his official bond as public administrator of Silver Bow County, Montana."

The district court did not have *jurisdiction* to make either of the above-quoted orders. State ex rel. Eakins v. District Court, 34 Mont. 226, 85 P. 1022. Each order is void. The making of each constitutes prejudicial error. These orders should be ordered stricken forthwith.

In the case of In re Sanborn's Estate, 98 Cal. 103, 105, 32 P. 865, 866, it is said: "The probate of a will can be contested only upon 'written grounds of opposition' filed by a 'person interested,' — that is, interested in the estate, *and not in the mere fees of an administration thereof.* Sections 1307-1312. Code Civil Proc. *A public administrator has no interest in an estate, or in the probate of a will. That is a matter which concerns only those to whom the estate would otherwise go.* In Estate of Parsons, 65 Cal. 240, 3 Pac.Rep. 817, one J. W. Parsons, had been appointed administrator, and afterwards a

document was offered for probate as a will of the deceased. Parsons, as public administrator, contested the probate, and afterwards charged the expenses of the contest in his account; but this court said: 'This item is not a charge against the estate. *It was the affair of the heirs, as such, to contest, if they wished, the probate of the document; not of the administrator.*' See, also, Roach v. Coffey, 73 Cal. 281, 14 Pac.Rep. 840, and cases there cited. *If a public administrator could legally assume the character of a standing contestant of wills, notwithstanding the wishes of heirs and devisees, he would certainly enlarge the sphere of his activities; but the limitations of the statute do not allow such inflation.''* Emphasis supplied.

In 20 Cal.Jur.2d, § 114, pp. 163, 164, it is said:

"Nomination of an executor is ordinarily a part of the will, and a person has the right, subject only to such limitations as may be imposed by law, to select whomever he may desire to carry out the terms of his will. It is the policy of the law to give effect, as far as it can legally be done, to the expressed will of the testator, evidencing as it does his confidence in the nominee, and it will not be thwarted unless the plain provisions of the law or the interests of justice demand it. Moreover, it is the general policy of the law to see that the testator's intentions are carried out insofar as they may be ascertained.''

Again the same authority (§ 113, pp. 162, 163) says:

"The selection of executors is not committed to the probate court. The testator is allowed to nominate such persons as he may see fit, provided they do not fall within the statutory classes of incompetent persons. * * * in the absence of objection the court must, when admitting a will to probate, appoint as executors those persons named as such in the will, if they are competent and have not renounced their right to appointment. The court has no discretion to do otherwise than obey the mandate of the statute.''

In re Sanborn's Estate, supra, was cited in the case of In re Estate of Golden, 4 Cal.2d 300, 48 P.2d 962, to the effect that the public administrator was not an interested person entitled to object to the probate of a will.

State ex rel. Eakins v. District Court, 34 Mont. 226, 85 P. 1022, involved the unauthorized activities of John B. O'Reilly, then the public administrator of Silver Bow County, who filed written objections to the probate of the will of John Eakins, deceased, wherein decedent's widow, Mary A. Eakins, was named as legatee and devisee as well as executrix of the will. O'Reilly, the public administrator, filed written objections to the probate of the will and petitioned the district court of Silver Bow County to appoint him administrator of the estate and, in the meantime, to appoint him special administrator.

In reviewing, on appeal these unauthorized activities of the public administrator in the Eakins' case, supra, this court, speaking through Mr. Justice Holloway, said:

"The only authority which a district court has for appointing a special administrator is found in section 2500 of the Code of Civil Procedure of 1895, [now R.C.M. 1947, § 91-1801], which reads as follows: 'When there is delay in granting letters testamentary or of administration, from any cause, or when such letters are granted irregularly, or no sufficient bond is filed as required, or when no application is made for such letters, or when an executor or administrator dies, or is suspended or removed, the court or judge must appoint a special administrator to collect and take charge of the estate of the decedent in whatever county or counties the same may be found, and to exercise such other powers as may be necessary for the preservation of the estate.' Of course, the phrase 'from any cause' means from any legal cause. The only cause for any delay whatever in this instance was the filing of the objections by the guardian *ad litem* and the court's

consideration of such objections. The court appears properly to have refused to consider the objections of the public administrator after this court annulled the order appointing him special administrator. *The public administrator has not any interest in an estate which entitles him to object to the probate of a will.* Section 2329, Code Civ.Proc., 1895 [now R.C.M. 1947, § 91-810]; In re Sanborn's Estate, 98 Cal. 103, 32 P. 865. \* \* \*

"Under this view of the matter, then, it was the duty of the district court to strike from the files the objections made by the public administrator and the so-called guardian *ad litem,* and proceed to hear and determine the petition for the probate of the will. *If these objections had been stricken from the files or wholly disregarded, as they should have been, there was not then any legal cause, nor any cause, for delay.* And if there had been any legal cause for appointing a special administrator, *the court directly violated the provisions of section 2502* [Code Civ. Proc. 1895, now R.C.M. 1947, § 91-1803] *of the Code of Civil Procedure of 1895, in appointing the person whom it did appoint, in preference to others first entitled to such appointment. But so far as this record shows, there was not any cause whatever for the appointment of a special administrator, and, in the absence of legal cause, the district court did not have jurisdiction to make the appointment of which complaint is made.* In re Ming, 15 Mont. 79, 38 Pac. 228. But it is said that, as this relatrix asked that she be appointed special administratrix pending the hearing of the petition for probate of the will, she cannot complain that the court appointed O'Reilly. *But, if the court did not have jurisdiction to appoint any one to such office, then nothing that this relatrix did could confer such jurisdiction. In point of law, there was not anything before the district court, except the petition for the probate of the will, and in appointing O'Reilly special administrator the*

*district court acted without any legal cause appearing why such appointment should be made, and, therefor, exceeded its jurisdiction.''* Emphasis supplied.

In his special concurring opinion in the Eakins' case, supra, Mr. Justice Milburn wrote:

"I concur. *A grand jury, commenting on probate matters in this state about 15 years ago,* in its report to the court said: *'Administration of estates is spoliation of estates.'* As it is always the property of the widow or children, or both, of the deceased person which pays the lawyers, executors, administrators, appraisers et al., and the size of the fees in most cases is fixed by the court, frequently with extra allowances for 'extraordinary services,' *the courts should be anxious and very careful to limit the number of lawyers and others officers to the fewest possible in number, and should not appear to insist on appointing self-seeking persons to lucrative positions.* In this case there seems to me to be undue persistency on the part of citizen O'Reilly in demanding that he be allowed to serve (not merely as public administrator, even if in his public capacity he could properly appear, which, as shown in Mr. Justice Holloway's opinion, he may not properly do). I think that our former determination of this matter ought to have been conclusive.

"*The district judge, sitting in probate proceedings, is the representative of the dead person,* his creditors, if any, and of the orphan, rich or poor, and of the law made for the protection of the sometimes helpless, *and should, in the exercise of his solemn duty, and of his own motion, oppose all efforts of strangers to profit by the death of the head of the family or of anyone else.* The district court should be earnest, active, anxious, and solicitous in all matters connected with the estates of deceased persons, and in dealing with the helpless children, with the intent to save as much as possible of the assets for those to whom they belong.

*He should not be complacent in dealing with people who are desirous of increasing the number of aids, assistants, counsel, administrators, et al., the employment of many of whom often almost, or entirely, swamps the estate.* The court also should see to it that estates are settled as soon as possible, thus avoiding expense running over too long a time.'' Emphasis supplied.

In State ex rel. Hill v. District Court, 126 Mont. 1, 3, 4, 5, 242 P.2d 850, 851, 31 A.L.R.2d 749, this court said:

"That part of R.C.M. 1947, § 91-810, relevant here, provides: '* * * Any person interested may appear and contest the will. * * *'

"In the case of In re Pepin's Estate, 53 Mont. 240, 163 P. 104, 105, this court, in construing this same statute, said: 'It is an elementary proposition that the the only persons authorized to contest or seek revocation of the probate of a will are those who, but for the will, would succeed in some degree to the decedent's estate. Rev. Codes, § 7407 [1907, now, R.C.M. 1947, § 91-1101]; State ex rel. Donovan v. Second Judicial District Court, 25 Mont. 355, 65 P. 120; Ingersoll v. Gourley, 72 Wash. 462, 130 P. 743; In re Wickersham's Estate, 153 Cal. 603, 96 P. 311; In re Zollikofer's Estate, 167 Cal. 196, 138 P. 995.'

" 'It is well-settled that a proceeding for revocation of probate of a will cannot be maintained by any person unless he is in some way interested in the will. If he is a legal heir of the deceased, that constitutes a sufficient interest. But, if he is not an heir, he must show that he has some interest in the estate of the deceased which the will he attacks would jeopardize.' In re Zollikofer's Estate, 167 Cal. 196, 138 P. 995, 996.

" 'It is an elementary proposition that the only persons authorized to contest or seek revocation of the probate of a will are those who, but for the will, would succeed in some degree to the decedent's estate. That "interest" which

gives one standing to contest a will must be direct and pecuniary and such as to be affected by the probate of the will.' 1 Bancroft's Probate Practice, 2d Ed., § 171, p. 416.

" 'Under statutes which permit the contest of wills by persons interested or claiming to be interested in the decedent's estate, the general rule is that a contestant must have some pecuniary or beneficial interest in the estate of the decedent that is detrimentally affected by the will. Although the right to maintain a will contest does not depend upon the extent or proportion of the contestant's share in the decedent's estate, or the amount of the detriment suffered by the contestant, it does depend upon the fact that the contestant may be deprived by the will of some interest of pecuniary value, worth, advantage, or use in the estate. The mere circumstance that a person may be interested in the administration, distribution, or partition of an estate is not sufficient if he will not suffer any detriment from the will. As stated, an interest in the property of the estate detrimentally affected by the will is the foundation of the right to contest it.' 57 Am.Jur., Wills, § 798, pp. 541, 542. * * *

" 'An interest in the property of the estate affected by the will is the foundation of the right to contest it. Brewer v. Barrett, 58 Md. 587; Johnston v. Willis, 147 Md. 237, 127 A. 862. * * *'

"In State ex rel. Eakins v. District Court, 34 Mont. 226, 229, 85 P. 1022, we held that a public administrator, who would be entitled to act and receive fees if there was no will, has no such interest as entitles him to object to the probate of a will."

The quoted concluding paragraph of the district court's order of August 9, 1957, and the quoted concluding paragraph of that court's multiple order of January 13, 1958, should be reversed, annulled, set aside and ordered stricken as being void *ab initio.*

It should be further ordered that no funds, moneys or other property or assets of this estate be allowed, delivered or paid to Emmett Kelly or to his counsel or on their behalf as or for costs, administrator fees or attorney fees herein or otherwise or at all, and that none such is their due.

It should be further ordered that the letters of special administration with the will annexed heretofore issued to Emmet Kelly be forthwith recalled, revoked and cancelled as being null and void.

*Right to Make a Will.* One of our most valuable rights is the right to make a will and control the disposition of our worldly goods after death. Thus a will, directing as it does the disposition of our property after we die, is one of the most important documents a person will ever be called upon to write. The law affords the right of testamentary disposition, R.C.M. 1947, § 91-101, and such disposition is to be gathered from the *words* and *language* we use in writing our will or wills and the codicils thereto.

By the *words* she employed in writing Exhibits Nos. 1, 2, 3, 4 and 5, Mabel French *left* all her property at death to Dr. Earl T. Gangner. She *left* nothing whatever to the appellant, Edyth M. Brown, or to the contestant, Harry McGee, or to anyone other than Dr. Gangner.

"A will is a means of transferring title to property." White v. White. Tex.Civ.App. 1943, 176 S.W.2d 987, at page 990.

By means of the *words* used in writing Exhibits Nos. 1, 2, 3, 4 and 5, Mabel French transferred the title to all her property, effective at her death, to Dr. Gangner so that all the property involved in this controversy is the property of Dr. Gangner.

*Supreme Court's Duty Herein.* In Padbury v. Nagelhus, 1957, 132 Mont. 417, 427, 319 P.2d 503, 510, Mr. Justice Castles, speaking for this court, with all justices concurring said:

"This being an action in equity, it is controlled by R.C.M. 1947, § 93-216. * * *

"Appeals in equity require disposal by this court which will 'put an end to litigation and avoid the necessity of new trials involving expense and the contingencies incident to delay.' State ex rel. United States Fidelity & Guaranty Co., etc. v. District Court, 77 Mont. 594, 600, 251 P. 1061, 1062; Bond v. Birk, 126 Mont. 250, 247 P.2d 199 (rehearing denied)."

In Shaw v. City of Kalispell, decided June 3, 1959, 135 Mont. 284, 290, 340 P.2d 523, 527, Mr. Justice Castles, with Mr. Justice Angstman and District Judge Flachsenhar, concurring, quoted with approval the above quotation from the Bradbury case, supra.

In Roth v. Palutzke, decided March 23, 1960, 137 Mont. 77, 350 P.2d 358, 359, this court speaking through District Judge Lester H. Loble, with Chief Justice Harrison and Justices Adair and Castles concurring, said:

"*Plaintiff* has not set forth any specifications of error in his brief as is required by Rule X, subd. 3, par. c of this court. * * * However, in view of the fact that the rule may be waived at the court's discretion (State v. Tursich, 127 Mont. 504, 267 P.2d 641), and that section 93-216, R.C.M. 1947, provides that *questions of fact shall be reviewed* in equity cases by this court whether presented by specifications of particulars or not, *we shall proceed to consider the merits.*" Emphasis supplied.

In his version of the instant appeal, Mr. Justice Castles states: "There has been no cross-assignment of error in this case and therefore we will not decide the validity of the typewritten will." This refusal to decide the validity of the witnessed will, Exhibit No. 2, is violative of the plain mandate of section 93-216, supra, which says that on appeals of this character "the supreme court shall review all questions of fact * * * and determine the same, as well as questions of law

\* \* \*.'' The refusal to decide and determine all the questions presented by the record now before us is contrary to this court's rulings and holding in the cases of Bradbury, Shaw and Roth, supra.

The original testamentary instruments, Exhibits Nos. 1, 2, 3, 4 and 5, have all been duly certified and transmitted to this court as part of the record on this appeal.

All five original instruments are now before us. They are on our desk as we write this review of the facts and the rules of law that here obtain.

Each and all of these instruments have been fully identified and proven by the testimony of the witnesses, Frank Quinn and Margaret H. Tullis, above set forth.

The provisions of section 91-204, supra, require that these five testamentary instruments ''be taken and construed *together* as one instrument.''

It is contrary to both the letter and the spirit of section 91-204 to divorce the instruments, one from the other. By so doing each instrument is subject to an independent contest, an independent trial and an independent appeal, until at long last, by reason of such needless and prolonged litigation, all the property is consumed in administrator's fees, attorneys' fees, and the costs and expenses incident to such contests.

The words written by Mabel French on the five sheets of paper marked as Exhibits Nos. 1, 2, 3, 4 and 5, express and constitute the valid will of Mabel French. All five instruments should be taken and construed together as one instrument and all should be admitted to probate on the evidence already introduced by the proponent, Dr. Gangner, at the two hearings and trials held in 1957.

The various erroneous rulings and orders of the trial court shown by the record herein should be reviewed and determined by this court here and now, to the end that the record in the trial court and the prejudice and wrongs occasioned

thereby may be corrected and remedied, and so that such erroneous rulings and orders be neither condoned nor repeated.

Failure to do this is failure to perform the duty imposed upon this court by statute. R.C.M. 1947, § 93-216.

For more than a quarter of a century Mabel French, the newswriter and editor, wrote understandingly for two powerful daily newspapers.

Now that Mabel French is dead, the five justices of this court are experiencing extreme difficulty in reaching a common understanding as to precisely what Miss French intended to say and do when she wrote the *words* appearing on the five dispositive testamentary instruments, Exhibits Nos. 1, 2, 3, 4, and 5 herein.

This court should order that Exhibits Nos. 1, 2, 3, 4 and 5 be admitted to probate as the decedent's last will and testament; that letters testamentary be issued to the named executor, Dr. Earl T. Gangner; and that the letters of administration with the will annexed heretofore issued to Emmett Kelly be set aside as null and void *ab initio*.

MR. JUSTICE BOTTOMLY.

I concur in the foregoing opinion of Mr. Justice Adair. Exhibits Nos. 1, 2, 3, 4 and 5, collectively, express the valid will of Mabel French. All the proof required for their admission to probate was supplied in the district court. There is no evidence whatever to sustain any of the charges of incompetency on the part of the named executor.

This court should order the admission to probate of the five exhibits and the issuance, to the named executor, of letters testamentary.

A retrial in the district court of these issues is neither required nor proper.